HAWTHORNE, Justice.
 

 This is a suit on a life insurance policy, in which the beneficiary named therein, widow of the insured, seeks to recover the face amount of the policy, $10,000. The insured, Lieutenant Commander Alfred G. Epp, a naval pilot, was killed in the crash of a navy plane near Page, Oklahoma, on November 14, 19S0. At the time of his death he was insured under a contract of life insurance with the defendant, The Penn Mutual Life Insurance Company. The defendant denies liability for the face amount of the policy, and contends that, under the terms of the “aviation risk provision” of the contract of insurance, its liability is limited to the return of the premiums, plus interest, because the insured died in the crash of a navy airplane while he was a pilot, officer or member of the crew of the airplane or, alternatively, while he was participating in aviation training. After trial on the merits, the plaintiff’s demands for the face amount of the policy were rejected, but she was awarded judgment for the amount of the cash premiums paid on the policy, with interest. From this judgment she has appealed.
 

 The aviation risk provision of the policy, which the defendant pleads limits its liability so as to exclude the risk that brought about the death of the insured and justifies its refusal to pay the face amount of the policy, reads as follows:
 

 
 *987
 
 “Aviation Risk Provision
 

 • “Limitation of coverage and liability. Death of the Insured resulting from service, travel or flight in, or descent from, any species of aircraft while the Insured is a pilot, instructor,
 
 officer or other member of the crezv of such aircraft or while the Insured is participating in aviation training
 
 is a risk not assumed under this policy and any .supplemental agreement attached to it, and the Company’s liability thereunder shall be limited to payment of the greater of the two following amounts, which shall be the Net Proceeds of the policy:
 

 “(i) The premiums paid on this policy, less any dividends (however applied) which have been apportioned to this policy, plus 'interest at the rate of 3 per cent a year compounded annually * * (Italics ours.)
 

 The insured, Lieutenant Commander Alfred G. Epp, U. S. N. R., was on active duty stationed at the United States Naval Air Station at New Orleans as a flight training officer. On November 9, 1950, Lieutenant Commander Epp made a request to his commanding officer for a cross-country flight to Lincoln, Nebraska, as follows:
 

 “From:
 
 Epp Alfred
 
 * * *
 

 “To : Commanding Officer
 

 ' “Subj: Cross 'Country Flight — request for ^ ^ ‡
 

 “1. It is requested that I be authorized to make an extended flight subject to conditions of reference 1 (a) and (b) in
 
 SNB-5
 
 to
 
 Lincoln Muni
 
 at
 
 Lincoln Nebraska
 
 which is
 
 720
 
 nautical miles from NAS, New Orleans direct. I expect to depart about
 
 1700, 11-12-50,
 
 and return, weather permitting, about
 
 1700, 11—14-50.
 

 “2.
 
 Sunset at NAS, New Orleans
 
 is
 
 about at
 
 1710
 
 on expected date of return.
 

 “I have studied the route to be flown over. I have passed all tests, etc. .required for extended flights in the Training Department. I have read references (a) and (b). I have a total of
 
 4000
 
 hours of Navy flying credited to me. The airport given as my destination has
 
 4
 
 runways with
 
 Hard Paved
 
 surface and are
 
 7100
 
 feet long. There is a hangar. There is. service and fuel available. It is an Army or Navy field. I have had
 
 3Ü
 
 cross country flights since 1 July, 1947. I have
 
 700
 
 hours in the type given above. I have had
 
 30
 
 hours in this type in the last six months. I have had
 
 15
 
 hours in this type in the last three months. I will make no local flight away from this station.
 

 “3. I will either confine my over-might stops to Government activities, or I will provide' adequate protectioa
 
 *989
 
 for my aircraft and Government gear by hiring a reliable guard for the period during my absence and by personally seeing that it is staked down and as completely as possible secured against damage by the elements.
 

 “4.
 
 If there is any reasonable doubt at my destination as to the security of the Naval aircraft I am assigned, either because of weather hazards or because of possible theft or damages, I will proceed at the earliest possible opportunity to the nearest place where it is reasonable to expect that proper security is available.
 

 "A. G. Epp
 

 “(Signature of Pilot)
 

 NAS NOLA
 

 “(Squadron to which assigned or Volunteer if assigned)”
 

 (Italicized words and phrases were filled in by handwriting on typed or printed form.)
 

 Pursuant to this request, the commanding officer or the Naval Air Station, New Orleans, issued the following order addressed to Epp:
 

 “U. S. NAVAL AIR STATION
 

 “New Orleans, Louisiana
 

 «* * *
 

 “9 Nov. 1950
 

 “From: Commanding Officer, NAS,
 

 New Orleans
 

 “To: L C D R Alfred G. Epp, USNR,
 

 112427/1315
 

 “Subj: Temporary additional duty orders.
 

 “1. On or about 12 November 1950, you are authorized to proceed to the Naval Air Station, Lincoln, Nebraska, for temporary additional duty for the purpose of proficiency in night cross-country training.
 

 “2. Travel by Government Air is directed.
 

 “3. No per diem or travel funds will be allowed while on this temporary additional duty. The above is authorized with the understanding that you will be entitled to no expenses in connection therewith. In case you do not desire to bear this expense, you will regard this authorization as revoked.
 

 “4. Upon completion of this temporary additional duty of approximately two days, you will return to the U. S. Naval Air Station, New Orleans, and resume your regular duties.
 

 “L. R. McAboy
 

 “Acting”
 

 An identical order was issued to Lieutenant Commander Irvin H. McPherson. On November 12, 1950, at about 5 :00 p. m., Epp and McPherson, accompanied by Lieutenant Norvin K. Scheffler, were officially logged out of the Naval Air Station at New Orleans, and their flight in a navy plane cleared for Lincoln, Nebraska, via Barksdale Field. Epp and McPherson clearly were aboard this plane under duty
 
 *991
 
 orders, and the record leaves no doubt that Scheffler was likewise authorized to participate with them in this training flight under active duty status. At the time the plane left the Naval Air Station at New Orleans, Epp was acting as pilot. This aircraft arrived at its destination, Lincoln, Nebraska, at 11:00 p. m. on the same day of departure from New Orleans.
 

 On November 14, shortly after 3:00 p. m., the same plane, with these three men and two others aboard, left Lincoln for return to the Naval Air Station at New Orleans, via Barksdale Field, Shreveport, Louisiana, under the following flight plan, according to the finding of. the commanding officer at New Orleans based on information on file at Lincoln:
 

 “Pilot: LCDS. Irvin H. McPherson
 

 “Co-Pilot: Lt. Norvin K. Scheffler
 

 “Member of the Crew: L C D R Alfred G. Epp
 

 “Passengers: Lt. Eddie O. Phillips
 

 “Lt. William Q. Stroud”
 

 At the takeoff in Lincoln, McPherson was at the controls or acting as pilot, and Scheffler' as co-pilot. Lieutenants Phillips and Stroud were being provided with military air transportation under special joint authority of the Army-Navy-Air Force. During the southbound flight the plane crashed near Page, Oklahoma, and a-11 those aboard were killed.
 

 Appellant, Mrs. Epp, widow of the insured, does not argue or contend that Epp was not a “member of the crew” or “participating in aviation training” on the northbound flight, but does contend that he “was aboard the aircraft on the southbound flight in a duty status, for transportation as a passenger, and was not aboard in the capacity of a crew member, nor in training”.
 

 There is no question that the death of the insured resulted from “service, travel or flight” in an aircraft, as set forth in the aviation risk provision. The only issue is whether he was a “member of the crew” or “participating in aviation training” at the time of the crash.
 

 A determination of whether he was a “member of the crew” requires an interpretation of that phrase as used in the aviation risk provision of the policy. For this purpose the meaning of the word “crew” must be inquired into in the light of the context in which it is used in this, provision.
 

 According to Webster’s New International Dictionary, 2d ed., the word “crew” in its largest sense means a company of people associated together. In this sense-the word would have included all those aboard the plane at the time of the crash,, for they were all associated together in the sense that they were
 
 occupants
 
 of the-same aircraft. But the context of the word shows that the provision means something-other than mere occupants of the plane. The words “pilot, instructor, officer * * ”' refute the interpretation that the provision.
 
 *993
 
 contemplated any such detached role as a mere occupant of the plane would have. The crew of the plane, under this provision, would be associated with one another for other purposes or by more considerations than mere occupancy of the aircraft.
 

 In the field of maritime law there are cases defining the word' “crew” of a watercraft, but those cases are not of any material assistance to us. here, for, as pointed out by appellant, the meaning of the word as applied to the crew of an airplane may have gained a different meaning under the different conditions existing in the field of aviation. . However, those cases are authority for the proposition that the word does not have an absolutely unvarying legal significance but must always be considered in its context. See 1 Norris, The Law of Seamen (1951), secs. 11, 12, 265, pp. 14, 15, 300.
 

 That the word-“crew” will have no more absolutely unvarying legal significance when applied to aircraft than when applied to watercraft is demonstrated by some of the regulations of the Civil Aeronautics Board dealing with civil aviation. Those provisions, of course, cannot be considered as decisive of the meaning of the word “crew” here, or as applying to navy or military questions. They are illustrative, however, of the point made here, that the term is a varying one in aviation, for they speak variously of “crew member”, “flight crew member”, “minimum flight crew”, “operating crew”, “two-pilot crew”, etc. 14 C.F.R., §§ 3.749, 41.121, 137, 62.8, 47.
 

 The courts of this country have had little occasion to interpret the term “member of the crew” as that term is used in aviation, but two cases have been cited to us where the term was used in an insuring provision in a policy rather than in an exclusion provision of the policy. Preferred Accident Ins. Co. v. Rhodenbaugh, 6 Cir., 160 F.2d 832, and Miner v. Western Casualty & Surety Co., 241 Iowa 530, 41 N.W.2d 557, 558, 14 A.L.R.2d 1358. In the first case the insured, who was employed as a flight test mechanic but who was working at the time of his death as a member of the ground crew, was killed when struck by a whirling propeller of an airplane which came up behind him. In the other case the insured was the manager and operator of an airport, and, while he was assisting the owner of a plane to get it started, a whirling propeller broke his arm. In these cases the insuring provision provided that the policy was to cover the insured while acting as a member of the crew, or crew member, of an airplane. The court in each case concluded that the insured, as a member of the ground crew, came within the insuring provisions of the policy and permitted recovery. In the Miner case, the court in discussing the meaning of the word “crew” had this to say:
 

 “The word is used in various senses, all of which as applied may be con
 
 *995
 
 sidered the ordinary and popular definition. Like many other words, it is governed largely by the context and in some cases by the manner in which applied. The crew of a ship might and would have a very different meaning from a crew of an airplane. In its general sense it means a body of men. It has several well-known significations. In its general and popular sense it is equivalent to company.” See also Annotation, 14 A.L.R.2d 1363.
 

 Let us now examine the facts and circumstances of this case to determine whether Epp was a “member of the crew” of this aircraft, by considering that term in the context of the whole provision wherein it is used.
 

 According to the record, he initiated the cross-country flight. He requested that he be authorized to make an extended flight to Lincoln, Nebraska, and gave his expected time of departure and time of return, weather permitting. This request showed his qualifications for such a flight authorization and contained his assurance that he would be responsible for the security of the plane and would care for it adequately on the flight.
 

 On the basis of his request he and McPherson were issued identical temporary additional duty orders. They were authorized to proceed on or about November 12, 1950, to the Naval Air Station, Lincoln, Nebraska, for temporary additional duty .for. the purpose of proficiency in night cross-country training. Under these orders travel by “Government Air” was directed, no per diem or travelling funds were allowed, and they were required, upon completion of this temporary additional duty of approximately two days, to return to the Naval Air Station, New Orleans, and resume their regular duties. While they were acting under, and carrying out, these duty orders, the crash occurred.
 

 At the time of the crash, McPherson and Scheffler were still at the pilot and copilot seats. By virtue of the fact that Epp was thrown clear of the plane, conclusion was made in the report of the Navy Investigation of the crash that he was probably standing between them at the time of impact. The other two officers, who were aboard the plane under transportation orders only, were in the passenger compartment.
 

 The findings • of fact of the Navy Investigation Report show, that the Investigating Officer found Epp, McPherson, and Scheffler to be “crew members”, and the other two aboard passengers. The commanding officer of the Naval Air Station, New (Means, found in his report to Chief of Naval Air Reserve Training that the plane departed from Lincoln under a flight plan listing McPherson and Scheffler as pilot and co-pilot (McPherson was also listed as pilot in a flight clearance form in the navy record), Epp as a member of the crew, and Stroud and Phillips as passengers.
 

 
 *997
 
 In consideration of all the facts and circumstances, then, Epp, McPherson, and Scheffler were the crew of this airplane because they were aboard it by virtue of orders assigning them to temporary additional duty for the purpose of proficiency in night cross-country training. The airplane was under their control, operation, and management for the entire flight, and its security was their responsibility until they got it back to the Naval Air Station, . New Orleans, as contradistinguished from .the lack of control or responsibility of the other two officers who were aboard under transportation orders only, were therefore passengers, and had no part in control or management of, or responsibility for, the plane.
 

 Commander McAboy of the Naval Air Station, New Orleans, admitted on the trial of the case that, in the sense that they were the group from the Naval Air Station, New Orleans, they were' all members of the crew, but he tried to convey by his testimony, and counsel for plaintiff try to show by argument, that Epp was not a member of the crew at the time of his death because he was. not at the controls at the time of the crash.
 

 It is plaintiff’s argument that, when the insurer drafted the provision employing the language “officer or other member of the crew”, it had in mind the navy definition of crew member,
 
 “enlisted personnel
 
 normally required aboard an aircraft in flight for the performance of duties necessary for the successful completion of the mission of the aircraft”, and was avoiding any possibility of the argument that a crew is limited to enlisted personnel.
 

 Plaintiff’s counsel say: “Our position is that the meaning and intent of the term [officer or other member of the crew], as used in the policy, is ‘those persons, other than the pilot, who are assigned to the aircraft for the purpose of performing a designated duty aboard said aircraft’.” But the limitation provision is not reasonably susceptible of such interpretation as is shown by the effect of that interpretation in this case. Not one.of these men was
 
 assigned
 
 to this aircraft for the purpose of performing a
 
 designated
 
 duty aboard the aircraft. Plaintiff’s own witness, Commander Mc-Aboy, made it clear on cross-examination that none of these men had assigned duties. They were free to decide among themselves who would be pilot and co-pilot (nothing even prevented Scheffler from moving over to the pilot’s seat although he was qualified as a co-pilot only), and to change their positions as many times as they pleased, and in the manner they desired, on the trip to Lincoln and back. It was purely a voluntary duty arrangement. Under this argument of plaintiff’s counsel, the plane would have actually had no crew at all because not one of them was assigned to a designated duty. We cannot reasonably say that the provision contemplated that any plane would make a flight without a crew, the result which would obtain under the facts
 
 *999
 
 and circumstances of this case and the interpretation urged by counsel.
 

 Counsel say, too: “ * * * the insurer * * * intended that a ‘member of the crew’ was someone who was normally
 
 required
 
 aboard and who had specific
 
 necessary duties
 
 to perform aboard the aircraft.” Again, none of these men had
 
 specific necessary duties
 
 to perform, so that this argument would reach as unreasonable a result as the prior one. It is., in effect, the same argument stated somewhat differently.
 

 They say: “Narrowing the exclusion even further, our position is that the meaning and intent of the policy is to make the exclusion applicable only if the insured, at the time of his death, was
 
 actually
 
 performing such duties.”
 

 The language of the provision itself clearly refutes this intention. It provides for exclusion of risk for “Death of the insured resulting from * * * travel or flight in, or
 
 descent
 
 from * * * aircraft
 
 while
 
 the insured is a * * * member of the crew * * * ”.
 

 If the insured has to be
 
 actually
 
 performing such duties to be a member of the crew, he would never be excluded as a crew member if he bailed out in an emergency, such as the one in this case, and was killed as a result of the descent, because he would not be actually performing such duties in the descent. We cannot agree with counsel that the insurer intended the provision to be applied only if the insured was
 
 actually
 
 performing his designated duty at the time of his death. The provision as a whole is not reasonably susceptible of such interpretation.
 

 Since the insured was a member of the crew of this airplane at the time of his death, he was not covered by the policy of life insurance.
 

 For the reasons assigned, the judgment appealed from is affirmed, appellant to pay all costs.