No. 47,538

ALLIANCE LIFE INSURANCE COMPANY, *Appellee*, v. ULYSSES VOLUN-
TEER FIREMAN'S RELIEF ASSN., ALYNE MAJOR, RANDEL MAJOR,
TERRY MAJOR and LE ANNA MAJOR, *Appellants*.

(529 P. 2d 171)

Opinion filed December 7, 1974.

*E. F. Russell,* of Ulysses, argued the cause and was on the brief for the appellants.

*Evart Mills,* of Mills and Mills, of McPherson, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: Alliance Life Insurance Company, of McPherson, brought this declaratory judgment action to determine its liability under a $10,000 accidental death policy it had written on Darrell Dean Major, of Ulysses, who was killed in an airplane crash. The defendants were the Ulysses Volunteer Firemen's Relief Assn., to whom Major had assigned his ownership rights under the policy, and Major's wife and children, the beneficiaries, all of Ulysses.

After the crash, which occurred in Grant county on October 1, 1972, claim was made under the policy and agents of Alliance entered into negotiations with counsel for the defendants. While those negotiations were pending Alliance brought this action on December 26, 1972, in McPherson county; all defendants were served in Grant county. They promptly moved to quash the summonses and to dismiss because of improper venue. When their motion was overruled, they renewed their objection to venue in their answer, and also counterclaimed for the face amount of the policy. An extensive pre-trial order was entered and the parties briefed their respective contentions. The trial court rendered a decision which reaffirmed its finding of venue, and construed the policy's "aviation exclusion clause" to be applicable to Major's activities when he was killed. Accordingly it rendered judgment in

favor of the plaintiff company and against the defendants, to the effect that "it is not indebted to them in any manner."

The defendants have appealed, their chief contentions being first, that McPherson county was the improper venue, and second, that the court erroneously found the policy's aviation exclusion clause to be applicable. We think both points are well taken.

The parties agree that under the facts of this case venue could only lie in McPherson county if that was the county "in which the cause of action arose." (K. S. A. 1973 Supp. 60-603 [3], 60-604 [2].) It is undisputed that the only contact any of the principals had with McPherson county was the acceptance of Major's application for the policy at Alliance's home office there. Beyond that: the defendant Fireman's Relief Assn. is officed in Grant county and was doing no business in McPherson county; Major lived in Grant county and his family still lives there; the airplane crash in which Major was killed occurred in Grant county.

Under conventional and accepted legal doctrine, because the application was accepted in McPherson county the contract of insurance was "made" in that county. (*Morrison v. Hurst Drilling Co.*, 212 Kan. 706, 512 P. 2d 438, and cases cited therein.) We take it as well settled, however, that the mere "making" of a contract, standing alone, does not give rise to a cause of action; there must in addition be a breach. See *Bruner v. Martin*, 76 Kan. 862, 93 Pac. 165; *Shearer v. Insurance Co.*, 106 Kan. 574, 189 Pac. 648; *Swift v. Clay*, 127 Kan. 148, 272 Pac. 170; *Lips v. Egan*, 178 Kan. 378, 285 P. 2d 767. Each of those cases stands for the proposition that the place of making a contract is irrelevant to the issue of where a cause of action arises for its breach; the controlling place is that of the breach, *i. e.*, the place where the obligor failed to fulfill his obligation. Insurance contracts are no different; in an action on a fraternal benefit certificate we held that the cause of action "arose" here when the insured died a resident of this state and the beneficiary was a resident of this state, although the contract of insurance was written in another state. *Hornick v. Catholic Slovak Union*, 115 Kan. 597, 224 Pac. 486. This is in accord with the encyclopedists:

". . . It is held that a cause of action for a breach of an obligation to pay under an insurance policy arises at the place where the insurer is to pay the loss, and where the policy is silent as to where the payment of the loss is to be made, it is presumably to be made at the residence of the insured, and therefore a cause of action arises and is maintainable in the county of the insured's residence where the insurer fails to pay in such county. . . . Within the meaning of a statute fixing venue in the county where a cause of action arises,

a cause of action on a life insurance policy arises in the county of the residence of the insured at the time of his death." (44 Am. Jur. 2d, *Insurance,* § 1898.)

See also, *Travelers Fire Ins. Co. v. Ranney-Davis Mercantile Co.* (10th Cir., 1949), 173 F. 2d 844, cert. den. 337 U. S. 930, 93 L. Ed. 1737, 69 S. Ct. 1495; 46 C. J. S., *Insurance,* § 1196.

Plaintiff contends, however, that this is not an action for a *breach* of the insurance contract—which it concedes would lie in Grant county—but merely one to *construe* a contract. A cause of action to construe a contract, it says, does not follow the normal rules just stated but arises where the contract is made. This proposition will not withstand analysis.

The declaratory judgment act is not designed to resolve academic disputes; there must be a case of "actual controversy" involving the "actual antagonistic assertion and denial of right." (K. S. A. 60-1701. See, *KAKE-TV & Radio, Inc., v. City of Wichita,* 213 Kan. 537, 516 P. 2d 929; *Wagner v. Mahaffey,* 195 Kan. 586, 408 P. 2d 602.) So long as Major, the insured, was alive the company had no "cause of action" to construe the exclusionary clauses of its policy, because it had no "controversy" with anyone. Whether any particular conduct on the part of the insured was or was not excluded was purely academic, and the courts would not have entertained an action to construe any of the policy's various exclusionary clauses. It was only when Major met his death by accident that an actual controversy between the company and the beneficiaries under the policy came into being; it was then that a cause of action of any kind first "arose."

Knowing when the cause of action arose is not enough, however; the issue here is *where it arose.* To determine that issue it is essential to examine the nature of that cause of action. While the company insists that it is simply a matter of construing the policy, our previous discussion has shown that no "cause of action" to construe the policy existed in the absence of a question of liability. The company's interest in construing its exclusionary clause in this suit was based solely on its desire to establish a defense to a potential action on the policy. In short, the real substance of the controversy here was not merely what the policy meant, but whether the company did or did not have a duty to pay the proceeds of the policy. This becomes apparent from the judgment sought and entered below: the trial court was not content to construe the exclusionary clause and stop, but went ahead and entered the judgment plaintiff requested, exonerating the company from all liability under the policy.

A comparable venue question confronted the court in *Garrison v. Morrow* (Tex. Civ. App., 1957), 300 S. W. 2d 175. In that case plaintiff filed a declaratory judgment action to construe a lease, and to have it declared still in effect. The action was brought in the county where the land was situated, on the theory that it was one for the "recovery of land" or to "quiet title." The defendants contended that because it was an action to construe a contract it should have been brought where the defendants resided. The court observed that in a delaratory judgment action it is the "nature and dominant purpose of the suit, as shown by the petition," that controls venue. (300 S. W. 2d at 177.) The court held that venue lay where land was located because "[t]he ultimate or dominant purpose of the suit is to have it adjudged that the lease contract is still in effect and that appellant is entitled to continue in undisturbed possession. . . ." (Ibid.) In answer to defendants' contention (strikingly like that of the company here) that the construction of the contract was the real thrust of the "cause of action," the court said:

"Because appellant [plaintiff] primarily and affirmatively seeks to have the lease contract construed, and since the construction that is given the lease when the case is heard on its merits will likely be determinative of the rights of the parties, *it is easy to mistakenly assume that having the lease construed is the end result sought. But appellant does not seek merely an abstract construction of the lease. Instead, he seeks the tangible benefits to be derived from having the lease construed as he contends it should be.* In other words, he seeks, as aforesaid, to establish title to a leasehold estate in land and to gain or retain possession of the premises described in the lease. *Construing the lease will be but an incident in determining whether this relief is to be granted or withheld,* even though the construction that is given it may be conclusive of the question." (Ibid. Emphasis added.)

So here, despite all its efforts to do so, the company cannot extricate its concern over the *meaning* of the policy from the issue of its *liability* under the policy. They are simply part and parcel of one controversy, and if required to resolve it, one lawsuit. Venue of that lawsuit lay in Grant county, where the contract was to be performed and where the breach occurred.

It seems clear that a contrary rule would encourage forum shopping and races to the court house. In any case where the insurer thought it had a policy defense it might think it advantageous to have the issue resolved in its local court. The policyholder who was slow to sue might find himself litigating in a remote or even foreign jurisdiction, having been dragged there willy-nilly by his

own insurance company. There he might well find it necessary to retain local counsel, and if factual disputes arose he and his witnesses would be required to incur travel and lodging expense. While an insured may not be able avoid such consequences if a "cause of action" under his policy in fact arises in a distant place, our venue statutes are designed to prevent such a situation at least where an insured has not ventured out of his home county. For a discussion of this problem in an interstate context, see *McGee v. International Life Ins. Co.*, 355 U. S. 220, 2 L. Ed. 2d 223, 78 S. Ct. 199.

We do not mean to suggest that a declaratory judgment action is not a proper tool for resolving a question of coverage under an insurance policy. What we are saying is that the venue of such an action is governed by the same rules as govern any other action on the policy.

We hold, then, that the trial court erred in overruling defendants' objections to venue when they were timely raised. Under K. S. A. 60-611 it then became the duty of the trial court to transfer the action to a "county of proper venue," in this case Grant county. It was not incumbent on the objecting party to request a transfer, as the company would suggest, or to specify the county to which the transfer should be made. Indeed, in a case where there is more than one county where venue is proper, under the statute the choice is plaintiff's.

Had this case been decided after a trial, requiring the weighing of evidence to resolve disputed facts, the holding just announced might well receive a reversal with directions to transfer the case to Grant county for a new trial. The decision, however, was made as a matter of law, based on stipulations as to facts, testimony, and —perhaps most important—the unavailability of testimony. As will be developed, it appears that a remand and transfer to Grant county would in all probability bring us the case again on a record identical with this one, at least insofar as the merits are concerned. Although a party's right to litigate in a proper forum is a valuable one, the law does not require pointless redetermination of legal issues where the results may be readily foreseen. Compare *Jones v. Insurance Co.*, 83 Kan. 682, 112 Pac. 826, on rehearing 85 Kan. 235, 116 Pac. 484. For this reason, and because the parties urge us to do so, we proceed to the merits.

The exclusionary clause on which the company relies provides that benefits will not be paid for any loss resulting from:

"b. Injuries sustained by the Insured while piloting or serving as a crew member of an airplane. . . ."

The issue is whether Major died "while piloting or serving as a crew member" of the plane that carried him to his death. The company recognizes that because we are dealing with an exclusionary clause it has the burden of proof on that issue. (*Williams v. Benefit Trust Life Ins. Co.*, 200 Kan. 51, 434 P. 2d 765, Syl. ¶ 6; *Bienz, Administratrix v. John Hancock Mutual Life Ins. Co.*, 195 Kan. 422, 407 P. 2d 222, Syl. ¶ 2.

The following facts concerning Major's death were stipulated or are undisputed: On October 1, 1972, Major was one of six members of a flying club which owned a 1946 Aeronca 7 AC airplane. He had been licensed as a student pilot since 1968, with 32.3 hours of logged flying time. He was not qualified under federal regulations to fly while carrying a passenger.

The Aeronca had a top speed of 90 m. p. h. It had two seats, one in front of the other, and was equipped with dual controls so that it could be flown from either seat. The instrument panel faced the front seat.

On the fatal Sunday Major was in the company of a Ulysses friend, Dr. James Greenwood. Dr. Greenwood had been flying since 1954, had logged almost 200 hours of flying time, and was licensed to carry a passenger.

They left Ulysses in the Aeronca at 1:30 p. m., with Dr. Greenwood in the front seat piloting. Their objective was to fly along the dry bed of the Cimarron River to look for deer. Some 40 minutes later they landed at Elkhart, where they refreshed themselves and refueled the plane. They had difficulty starting it, and received help from bystanders. Finally Major took a hand at spinning the propellor, and was successful.

At 2:10 p. m. they left Elkhart, this time with Major in the front seat and piloting. Almost two hours later the plane was observed and recognized by a party of hunters who were in the riverbed some 13 miles south of Ulysses, in Grant county. At about 4:00 p. m. they saw the plane make several low passes—at an altitude of 100-150 feet—make a steep climb, stall, and then crash nose first at full power. They were unable to say who was flying the plane when they saw it.

Major was killed instantly. Dr. Greenwood was seriously injured and six weeks later made a statement indicating a complete loss of memory for a period of two weeks surrounding the crash. About a

year later he made a second statement reflecting a much improved memory. Defendants were requested to admit that Dr. Greenwood would testify in accordance with his second statement, and in the absence of a response to the request are deemed to have admitted that he would so testify. K. S. A. (now 1973 Supp.) 60-236 (a).

It is Dr. Greenwood's statement-testimony which has Major "propping" the plane at Elkhart, and which puts Major in the front seat and at the controls when the plane left Elkhart at 2:10, and also when the search for deer along the river was resumed on the return trip. After that his memory fails him. He has no recollection of who was piloting when the plane crashed an hour and fifty minutes later. No one else was in a position to know. Both parties agree that there is simply no way to prove, even circumstantially, exactly what the two occupants of the plane were doing just before or at the time of the crash.

Under these circumstances it becomes crucial to know what burden the company must sustain if it is to show that Major died "while piloting or serving as a crew member" of the plane. In its brief plaintiff aptly summarizes the parties' respective positions below:

". . . The plaintiff contended that if Major piloted or served as a crew member *during the flight* he was excluded irrespective of what he was doing at the instant of the crash. In other words *the policy excluded the dangerous activity of being either a pilot or crew member on the flight* and what Major was doing at the instant of the crash was immaterial.

"The defendants contended that the insurance company must prove that Major was *doing the piloting or doing something as a crew member at the instant of the crash.* They argued that under *In re Estate of Hayden,* 174 Kan. 140, 254 P. 2d 813, and *In re Estate of Rivers,* 175 Kan. 809, 267 P. 2d 506, the trier of the cause could only surmise and speculate as to what each of the two men in the plane were doing at the time of the crash and that *it would be impossible for the plaintiff to prove that at the instant of the crash Major was doing anything. Under the stipulated facts and evidence such is true.*" (Emphasis added.)

The concession contained in the last sentence quoted reflects the realities of the situation as to the availability of evidence. As noted above, there is no way to tell who was flying the plane when it crashed; a trial on that issue would be fruitless because there is no evidence available which would bear on it.

In both the *Hayden* and *Rivers* cases, cited in the quoted material, the plaintiff sought to establish the decedent's liability for the negligent operation of an airplane. In each case the plane had dual

controls, and there was no direct evidence as to who was piloting the plane when the acts of allegedly negligent flying took place. In *Hayden* the court reviewed a number of dual-control cases and concluded that where no survivor could testify as to the event, the presence of the dual controls made any inference as to who was at the controls a matter of "speculation, surmise or conjecture." (174 Kan. at 152.) The court rejected circumstances at least as persuasive on that issue as those present here, saying, "We are not in accord with the appellee's view that when three acquaintances take off from an airport in an airplane, equipped for dual flying, the fact one of them was the owner of the plane and was seated in the left-hand or driver's seat at the time it took off from such airport . . . creates a presumption or warrants an inference that the owner continued to operate and was at the controls of the plane at the time of a crash." (Id., pp. 151-2.) In *Rivers* the court reached the same result in a similar fact situation. One who must prove which of two pilots was flying a dual control plane, in the absence of direct evidence, has an impossible burden.

It is for this reason that the company takes the position that the phrase "while piloting or serving as a crew member" should be given a broad construction so as to carry out what it asserts was the company's intention to exclude coverage if the insured engaged in those "dangerous" activities at any time during a flight.

This essentially was the construction adopted by the trial court when it found that "the insurance contract contemplates consideration of the entire flight, and not just the instant of the crash." It further found that "Piloting of the plane by Major on the flight and Major's other services concerning the use and operation of the airplane as a crew member are sufficient to establish the exclusion." The reference to "other services" as a "crew member" apparently was evoked by Major's acts in helping get the plane out of the hangar at Ulysses, and in "propping" the plane to get it started at Elkhart.

The defendants, on the other hand, point out that "while piloting" certainly sounds as if it means "while at the controls" of the airplane. Likewise "while serving as a crew member" would seem to require some *duties* as a crew member which, if not actually being performed, at least would be prescribed and anticipated. The little airplane here, they say, has no "crew." Of the two occupants, one is the pilot and the other is a passenger at any one time in flight. Further, any services Major performed which might be regarded as

making him a member of a "ground crew" were long over and done with when the crash occurred, so he was not killed "while serving" as a ground crew member.

Recognizing that we have no cases of our own construing a similar aviation exclusion clause, each side has cited cases from other jurisdictions which lend some support to their respective positions. The closest factually, it would seem, is *VanderLaan v. Educators Ins. Co.*, 356 Mich. 318, 97 N. W. 2d 6, where the policy excluded coverage if the insured was killed "while operating . . . or serving as a member of the crew" of an aircraft. The resemblance to the clause in question here is obvious. He was covered if he was "traveling as a passenger."

On an extended flight the insured had operated the plane on numerous occasions, was listed on flight plans as the pilot, handled the radio, and was in the left or pilot's seat when it crashed. As here, there was no way of knowing whether he or another qualified pilot was actually at the controls at the time of the crash. The court's description of the contentions of the parties might have been tailored for those of the parties here:

". . . Defendant [company] says that the question of assured's 'traveling as a passenger' or 'serving as a member of the crew' is one of his *status on the plane during the entire trip*. Plaintiff, as did the trial court, views the question as being one of what the assured *was or was not doing just before and at the time of the crash*." (356 Mich. at 323. Emphasis added.)

The court held that it did not matter that the insured had previously flown the plane during the flight saying:

". . . We note that the words therein 'operating' or 'serving as a member of the crew,' as is also true of the term 'traveling as a passenger' in section 4, are not words denoting status, but action. The exclusion applies 'while operating . . . or serving.' Nothing in the language of section 6 permits holding that the exclusion applies while assured is not so 'operating' or 'serving' merely because of an alleged status acquired by his earlier having engaged in 'operating' or 'serving.' At the time of the crash he either was or was not operating the plane or performing some other service of a crew member." (*Id.*, p. 324.)

A similar distinction between "status" as a crew member and the actual performance of duties relating to the operation of the aircraft as such may be found in *American Casualty Company of Reading, Pa. v. Mitchell* (8th Cir., 1968), 393 F. 2d 452. And in *New York Life Insurance Company v. Atkinson* (10th Cir., 1957), 241 F. 2d 674, the word "crew" in an aviation exclusion clause was held to be ambiguous. By construing it strictly against the insurer it was held not to exclude a back seat "observer" in a dual control plane con-

structed like our Aeronca, because his duties did not relate to the operation, maintenance or upkeep of the plane.

On the other side we find *Travelers Ins. v. Warner*, 169 Col. 391, 456 P. 2d 732, where the policy excluded coverage if the insured was "serving as a member of a crew of . . . an aircraft." The court held that the decedent was excluded by this clause where he owned the plane, had a commercial license and more experience than the other pilot, prepared and filed the flight plan, handled the radio in flight, and occupied the co-pilot's seat. The insured, the court found, was "in command" of the plane. The court recognized that the *VanderLaan* case was closely in point but concluded, "We simply reach a different conclusion than that of the learned Michigan court." (169 Col. at 395.) Other cases holding somewhat similar exclusionary clauses applicable under varying factual circumstances, include *Le Breton v. Penn Mut. Life Ins. Co.*, 223 La. 983, 67 So. 2d 565, where the insured was a Naval officer listed on the flight plan as a "member of the crew;" and *Smith v. Prudential Insurance Company of America*, 300 S. W. 2d 435 (Mo., 1957), where the insured was an Air Force officer listed on the flight records as the "co-pilot."

We could decide the issue before us by opting for one or the other of these two lines of cases. On balance, the *VanderLaan* line seems more persuasive in the light of the "while piloting" and "while serving" language employed by the company here. But at this point two interrelated, fundamental and well established principles governing the construction of insurance contracts come into play. Both are succinctly restated in *Gowing v. Great Plains Mutual Ins. Co.*, 207 Kan. 78, 483 P. 2d 1072. The first is:

"In determining the intention of the parties to a contract of insurance, the test is not what the insurer intends the printed language to mean, but rather what a reasonable person placed in the position of the insured would have understood the words to mean." (Syl. ¶ 2.)

Under this principle, what Alliance meant when it inserted the exclusionary clause is irrelevant. We look only to what the proverbial reasonable man in Major's shoes would have understood. We think he would have expected coverage if he was riding in an airplane that someone else was flying, and that he would not have expected to lose it just because he pushed the airplane on the ground or took a turn at spinning the propeller.

The second applicable principle is:

"Where provisions of an insurance policy are ambiguous or conflicting,

the policy is to be construed strictly against the insurer and in favor of the insured."

"Where an insurer intends to limit or restrict the coverage under its policy, it should use language which clearly reveals its stated purpose." (Id., Syl. ¶¶ 1, 4.)

The mere fact that there is such a contrariety of judicial opinion over what constitutes "piloting" or "serving as a crew member" of an airplane demonstrates, we think, the inherent ambiguity of these phrases. The parties here and the parties in all those other lawsuits have each been able to make tenable arguments for construing the same language in different ways, and the courts have done the same. We certainly can't say that the language used by the insurer here "clearly reveals its stated purpose."

That there is language available which would do just that is apparent from the cases collected in the annotations at 155 A. L. R. 1026, 17 A. L. R. 2d 1041, and the Later Case Service thereto. In those annotations some 56 different aviation exclusion clauses are collected and annotated. Many of them would have clearly excluded coverage under the facts of this case, had they only been employed by Alliance in its policy.

Applying a strict construction to the exclusionary clause we reach a result contrary to that reached by the court below. We hold that to render it applicable the company must show that at the time of the crash, or at least at a time when the crash was imminent, Major was either piloting the plane or actually performing or prepared to perform some function as a member of the crew. The company concedes that it cannot do so. It includes in its brief not only the concession quoted above, but the following:

"Certainly, if plaintiff has to prove that Major was actively engaged in piloting the plane or actively engaged in doing something as a crewman *at the instant of the crash,* such proof . . . would be impossible. Plaintiff recognizes that proof of an exclusion is an affirmative defense of an insurance company and failure to make such proof renders the insurance company liable on the policy."

The only possible bar to liability might be a further contention that once the plane landed at Ulysses Major would again serve as a member of the "ground crew" in putting the plane away. That, like his previous services on the ground, would be too remote to permit us to say that he was killed "while serving" as a member of the ground crew.

Since the company concedes liability on the policy if we construe

it as we do, on the merits judgment must be rendered for the defendants for the proceeds of the policy.

Defendants also ask for attorney fees, an issue not considered below. In our opinion there was sufficient merit to the company's position that such an allowance should not be made. Cf. *Forrester v. State Farm Mutual Automobile Ins. Co.*, 213 Kan. 442, 517 P. 2d 173; *Sturdy v. Allied Mutual Ins. Co.*, 203 Kan. 783, 457 P. 2d 34.

The judgment is reversed and the case is remanded with directions to enter judgment for the defendants in accordance with the foregoing opinion.

APPROVED BY THE COURT.

FROMME, J., dissenting. Although I am in agreement with the court on the venue question and on the construction and meaning of the exclusionary clause I cannot agree that counsel for the insurance company by admissions deprived the company of the right to go to trial on the issue of who was piloting the plane when it crashed.

The following written statement of Dr. Greenwood must be accepted as true:

"After the engine started Darrell came around and asked if I wanted to fly back, I said 'no, I flew over, you fly back and I'll look for deer.' I then got out of the front seat and into the rear seat. Darrell Dean Major then got into the front seat and flew the plane on the takeoff and I remember his flying over to the Cimarron River and flying along the river towards Ulysses, Kansas, while I looked for deer.

"I have no recollection of anything further concerning the flight and my next recollection is of being in a hospital at Wichita, Kansas."

Thus we have the statement of one of the occupants that Major was to fly the plane on the return trip and did so on takeoff. In addition we have the statement that he was flying along the river toward Ulysses, Kansas, when the memory of Dr. Greenwood fails him. I am of the opinion that the foregoing evidence is sufficient from which the trier of fact may find a reasonable inference that Major was piloting the plane when it crashed.

The argument and admission of counsel for the insurance company is taken out of context and should not be taken as a concession that the circumstantial evidence was wholly insufficient to raise a reasonable inference that Major was piloting the plane when it crashed. What counsel was saying is that Major was dead and Dr. Greenwood's memory of events did not extend to the instant of the crash, therefore no witness could testify that he saw Major piloting the plane when it hit the ground.

I do not believe such testimony is necessary in order to make a submissible case. Testimony that Major and Greenwood talked it over and decided that Major should pilot the plane on the return trip plus the fact that Greenwood was in the plane and saw Major piloting on takeoff and later as they approached the crash point is sufficient to have the issue go to the jury.

The cases of *In re Estate of Hayden,* 174 Kan. 140, 254 P. 2d 813, 36 A. L. R. 2d 1278, and *In re Estate of Rivers,* 175 Kan. 809, 267 P. 2d 506, do not, in my opinion, compel the result reached by the majority. In *Hayden* and *Rivers* the actions were based upon the negligent operation of the airplanes. In such cases it was necessary to establish not only negligence on the part of the pilot but also to establish which of two men were piloting. In both cases all persons in the planes were killed and there was no testimony as to who might have been piloting the plane prior to the accident. The speculation which prevented submissible cases involved not only who was piloting but also what acts of negligence were the proximate cause of the crashes.

I would reverse the case with instructions to transfer venue to Grant County where the trier of fact should determine the question of whether Major was piloting the plane when it crashed.

FONTRON and KAUL, J. J., join in the foregoing dissent.