**Nancy P. KEYSER, Plaintiff,**

v.

**CONNECTICUT GENERAL LIFE INSURANCE CO., Defendant.**

No. 84 C 10130.

United States District Court, N.D. Illinois, E.D.

Sept. 26, 1985.

Thomas G. DiCianni, Brodie & Reynolds, Chicago, Ill., for plaintiff.

Marvin Glassman, Rabens, Formusa & Glassman, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Nancy Keyser ("Mrs. Keyser") seeks to recover from Connecticut General Life Insurance Co. ("Connecticut General") the proceeds of an accidental death indemnity rider to a life insurance policy on the life of Mrs. Keyser's son, John F. Keyser ("John Jr.").[1] Each litigant has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Mrs. Keyser's motion is denied and Connecticut General's is granted.

### Facts [2]

In 1980 Connecticut General issued a $50,000 ordinary life insurance policy to John Jr., with his father John E. Keyser ("John Sr.") and Mrs. Keyser as co-beneficiaries. As is frequently the case, the policy contained a $50,000 "accidental death benefit" rider payable in case of John Jr.'s death "as a result of bodily injury effected directly ... through external, violent and accidental means." Among the limitations on the accidental death benefit was the one at issue in this case:

> The insurance under this rider also does not cover death caused by ... (g) travel or flight in any aircraft while the Insured is a pilot or member of the crew of such aircraft, or while the aircraft is operated for aviation training or experimental purpose....

Upon the death of John Jr., Connecticut General paid the basic $50,000 coverage to Mrs. Keyser but refused to pay the accidental death benefit.

John Jr. was killed when a single-engine two-seat Pitts S–2A biplane (the "Pitts"), which he and his wife owned, crashed into Lake Michigan. At the time of the crash John Jr. and John Sr., both licensed pilots, were in the Pitts, John Jr. occupying the rear seat and John Sr. the front. Lloyd Reinhardt ("Reinhardt"), a friend and frequent flying companion of the Keysers who had flown in the Pitts, testified [3] the plane had a full set of controls at each seat and could be piloted from either without mechanical adjustment or special prearrangement. Typically the person controlling the plane would simply say to the other person, "You got it" or "It's yours," and the other person would take over (Dep. 71, 83–84). Despite the dual controls, the rear seat is

---

**1.** Mrs. Keyser originally sued in the Circuit Court of Cook County. Connecticut General (a citizen of Connecticut, both its state of incorporation and its principal place of business) removed the action to this District Court on diversity of citizenship grounds, Mrs. Keyser being an Illinois citizen (that fact, asserted in the removal petition, has been confirmed at this Court's request by a letter from Mrs. Keyser's lawyer).

**2.** Familiar Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University*, 726

F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must, in viewing the evidence, draw all reasonable inferences in the light most favorable to the nonmovant. *Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984). As the text discussion will reflect, there is considerable room for inference-drawing here. Hence this opinion reflects the double perspective compelled by cross-motions for summary judgment.

**3.** Because Reinhardt is the key witness on a number of issues on the current motions, the frequent references to his deposition testimony will simply take the form "Dep.—."

normally considered to be the pilot's seat, both because the visibility is better from that seat (Dep. 69, 86–87) and because the ignition switch is there (Dep. 72).

Reinhardt ran into John Jr. in the lounge of the Waukegan airport on the afternoon of August 20, 1983. Reinhardt suggested they go flying (Dep. 14–15). After John Sr. arrived at the airport about a half hour later, they agreed to take off (Dep. 17–19). No flight plans were filed (none was required).

Reinhardt took off first in his own plane, followed by the Keysers in the Pitts. They flew over Lake County, Illinois, keeping both visual and radio contact between the two planes. Both Keysers spoke over the radio to Reinhardt at various times during the flight (Dep. 32–33). At one point John Jr. said they were circling over the home of some of his friends near Fox Lake (Dep. 33–34). Then John Jr. suggested the planes fly to Racine, Wisconsin, which they did (Dep. 34–36).

Once the planes reached Racine, Reinhardt announced he was returning to Waukegan for an appointment. Both planes turned south along the shore of Lake Michigan, and after a few minutes Reinhardt headed west toward the airport. He last saw the Pitts flying level and pointed straight south (Dep. 43). One of the Keysers said, "We're going up," but Reinhardt could not tell which one had spoken because the radio was unclear (Dep. 42–43). Reinhardt had no further radio contact with the Pitts, for he switched his radio to the frequency used to announce arrival at the airport (Dep. 43).

According to a written statement given to the National Transportation Safety Board ("NTSB") by William O'Brien ("O'Brien"), an eyewitness standing on the lake shore, the Pitts passed him overhead shortly after Reinhardt's plane. Then the Pitts climbed straight vertically for some 250 feet, leveled off for about a second, then dropped, nose first, straight downward. It did two aileron rolls [4] with a slight pause between them, then entered the water. Both Keysers were killed.

### Mrs. Keyser's Motion

Mrs. Keyser advances a series of propositions in support of her summary judgment motion:

1. John Jr. unquestionably died from bodily injury resulting from an accident, the conditions triggering payment of the accidental death benefit.

2. Because the policy rider's exclusionary clause is an affirmative defense against payment, Connecticut General would bear the ultimate burden of proof at trial.

3. It will never be known who was piloting the plane at the time of the crash, for either John Jr. or John Sr. could have been controlling the Pitts.

4. Connecticut General has offered neither (a) any evidence that John Jr. was the pilot nor (b) any basis from which this Court may presume he was the pilot.

Though the first three of those assertions are true, they fail in the aggregate—both because the fourth assertion is wrong and because, in any event, the assertions are not fully exhaustive in legal terms.

It is basic to Rule 56 jurisprudence that the movant bears the burden of demonstrating the absence of a genuine issue

---

**4.** O'Brien's statement does not define "aileron roll." From the diagram drawn to accompany his statement to NTSB, it appears the plane twice rotated 360 degrees around its longitudinal axis. See *Webster's Third New International Dictionary* (1976), defining "aileron roll" as "a flight maneuver in which an airplane is rotated about its longitudinal axis through a full 360 degrees by means of its ailerons without altering its flight path." What is not clear from O'Brien's statement is whether the term "aileron roll," which seems to be a technical usage implying an intentional maneuver, was in fact used by him as a person knowledgeable about flying or was instead the phraseology of the officer who took the report, putting into shorthand form O'Brien's layman's description. That possible ambiguity creates implications discussed later in the text.

of material fact. *Korf,* 726 F.2d at 1226. Where that burden is not met, summary judgment cannot be entered even if the opposing party fails to respond to the motion. *Big O Tire Dealers, Inc. v. Big O Warehouse,* 741 F.2d 160, 163 (7th Cir. 1984). But once the burden has been met, the opponent must come forward with specific facts showing the existence of a genuine and material factual issue. *Id.* at 163.

As Mrs. Keyser has (inaccurately) framed the dispute, one factual question would be dispositive of this litigation: whether or not John Jr. was piloting the Pitts at the time of the crash. If he were, of course, payment of the accidental death benefit would be precluded. But if he were not, two questions would still remain:

    1. whether he was a "member of the crew of such aircraft" [5] at that time; and

    2. even if he were not, whether the exclusionary clause bars coverage so long as John Jr. was "a pilot or member of the crew" of the Pitts at any time during its fatal flight.

Any uncertainty on either score (subjects not addressed by Mrs. Keyser's analysis) would be fatal to her motion. And it scarcely requires discussion to conclude there is at least uncertainty in those respects.

Nonetheless, because Mrs. Keyser advances her position so earnestly, this opinion will deal with matters (only arguendo) on her terms—as though identity of the pilot at the time of impact were the controlling question. Again, Mrs. Keyser does not say John Jr. was *not* the plane's pilot. Rather she says Connecticut General cannot prove he *was,* which it must do to defeat her recovery.

It is to that end she urges we will never know for certain who was the pilot, given the dual-control design of the Pitts. Lack of certainty, however, does not convert an issue into a non-issue. While at trial Connecticut General would bear the burden of proving John Jr. was the pilot (and thus, in the absence of any evidence at all, would lose on Mrs. Keyser's thesis), its burden is only the burden of proof by a preponderance, or the "greater weight," of the evidence. *Sundquist v. Hardware Mutual Fire Insurance Co.,* 371 Ill. 360, 365, 21 N.E.2d 297, 300 (1939).

Mrs. Keyser has offered no evidence whatever tending to prove John Jr. was not the pilot when the plane crashed. Conversely, from such evidence as there is, inferences may be drawn favorably to Connecticut General tending to prove he was. John Jr. owned the plane. He sat in the rear seat, normally where the pilot would sit. It was he who suggested to Reinhardt that the two planes set a course for Racine. While there appears to be no Illinois case in point, .other jurisdictions have looked at similar factors in determining that the identity of the pilot in the crash of a small dual-control airplane was properly for the jury.

Thus *Insurance Co. of North America v. Butte Aero Sales & Service,* 243 F.Supp. 276, 281 (D.Mont.1965) pointed to such factors as ownership of the plane, the seat occupied by the putative pilot and radio contact made by the putative pilot with the airport. While the court acknowledged the impossibility of knowing to an absolute certainty who was the pilot, it held those facts formed a sufficient basis for a jury's verdict.

More factors were available to the court in *Todd v. Weikle,* 36 Md.App. 663, 376 A.2d 104 (1977). There too a jury question was found in evidence as to the seat occupied by the putative pilot, the fact he had made radio contact with the control tower shortly before the accident, the fact he owned the plane and was the more experienced of the two potential pilots, the facts the other pilot had no experience with instrument flying and weather conditions were such as to require instrument flying

---

**5.** It will be recalled the policy rider speaks in the disjunctive of "pilot or member of the crew."

and the fact the instruments themselves were in front of his seat. 376 A.2d at 109–11.

Connecticut General does not rest wholly on ownership, seat location (including the placement of the engine controls at John Jr.'s seat) and radio communication to establish the triability of the issue. It has submitted the affidavit of University of Illinois Professor Weldon Garrelts, who declares himself an expert on aviation accidents (and whose credentials are adequate to permit opinion testimony on the current summary judgment motions). Based on the statement of eyewitness O'Brien, Professor Garrelts opines that the Pitts was engaged in an aerobatic (or "stunt") maneuver at the time of the crash. That is relevant because both Reinhardt and Mrs. Keyser stated John Jr. was an aerobatic pilot (Reinhardt said he was "excellent," better than Reinhardt himself, Dep. 62) while John Sr. was not—he was, in Reinhardt's words, "against" aerobatics (Dep. 62; and see Nancy Keyser Dep. 9). Given the strong evidence that if the Pitts were flying an aerobatic maneuver John Jr. would have been the pilot, it would surely be for the jury to decide whether or not the steep climb, the steep descent and the aileron rolls described by O'Brien amounted to such a maneuver.

Even apart from her wrong turn at the outset, Mrs. Keyser has surely not met her burden of establishing there is no issue of material fact. Beyond that, Connecticut General has pointed to facts creating reasonable inferences that would render triable even Mrs. Keyser's question: whether or not John Jr. was the pilot of the airplane at the time of the crash. Accordingly Mrs. Keyser's summary judgment motion must be and is denied.

### Connecticut General's Motion

Connecticut General begins by focusing on the policy language Mrs. Keyser chooses to ignore: It argues Jack Jr. (whether or not he was actually piloting the Pitts at the time of the crash) must as a matter of law

be considered a "member of the crew" for purposes of the rider's exclusionary clause. Because the policy does not define "crew" or "member of the crew," Mrs. Keyser retorts the clause is ambiguous. She therefore invokes the principle calling for ambiguities in insurance contracts to be construed in favor of the insured. See, e.g., *FSC Paper Corp. v. Sun Insurance Co. of New York*, 744 F.2d 1279, 1282 (7th Cir.1984).

It is true Connecticut General could have chosen to define "member of the crew," just as it defined "military or naval service" and "war," terms that appear in another provision of the exclusionary paragraph (this time clause (h)). That fact— the insurer's ability, in drafting the contract of insurance, to define such potentially problematic provisions—is part of the basis for the role of construing ambiguities against the insurer. *Wahls v. Aetna Life Insurance Co.*, 122 Ill.App.3d 309, 313, 77 Ill.Dec. 843, 847, 461 N.E.2d 466, 470 (1st Dist.1983).

Nevertheless, neither the mere absence of a policy definition nor the presence of a dispute as to the meaning of the provision necessarily renders it ambiguous as a matter of law. *Western Casualty & Surety Co. v. Brochu*, 105 Ill.2d 486, 495, 86 Ill.Dec. 493, 497, 475 N.E.2d 872, 876 (1985) put it simply:

> If the words of a policy can reasonably be given their plain, ordinary, and popular meaning, the provisions shall be applied as written and the parties should be bound to the agreement they made.

No Illinois court appears to have had occasion to deal with any airplane exclusionary clause to accidental death benefit policies in any context relevant here: either by construing "crew member" language or by deciding as of what time the "pilot" or "crew member" determination must be made. However, courts elsewhere have looked at some facets of like phrases, with mixed results.

In some cases the problem has been whether the "crew" embraces only persons

whose duties are connected with flying the plane or also extends to persons engaged in other activities for which the plane provides only transportation. See, e.g., *American Casualty Co. v. Mitchell*, 393 F.2d 452, 457 (8th Cir.1968) (participant in a Civil Air Patrol flight, whose duty was to observe the ground for evidence of a prior plane crash, held not a "member of the crew" for exclusionary clause purposes); *New York Life Insurance Co. v. Atkinson*, 241 F.2d 674, 675–76 (10th Cir.), *cert. denied*, 353 U.S. 959, 77 S.Ct. 865, 1 L.Ed.2d 910 (1957) ("observer" on an oil-exploration flight, whose only duties were to operate prospecting equipment, held not a "member of the crew" under exclusionary clause).

That problem, of course, is clearly not posed here. There is nothing whatever to indicate John Jr. was performing some sort of airborne mission apart from flying or helping to fly the plane.

Another and more relevant issue—one producing divergent lines of authority—has been whether the exclusionary clause is triggered by a person's status as a pilot or crew member during a flight, or solely by his or her active conduct of pilot or crew-member duties at the moment the crash occurs. *Alliance Life Insurance Co. v. Ulysses Volunteer Fireman's Relief Association*, 215 Kan. 937, 529 P.2d 171, 179–80 (1974) construed language excluding coverage "while piloting or serving as a crew member" in favor of the beneficiary, holding coverage excluded only if the insured were performing as a pilot or crew member at the moment of the crash—a factual burden of proof the insurance company conceded it could not meet. *Vander Laan v. Educators Mutual Insurance Co.*, 356 Mich. 318, 97 N.W.2d 6, 7–9 (1959), relied on heavily by Mrs. Keyser, also construed exclusionary language written in an active voice ("while operating ... or serving as a member of the crew....") to require the insurance company to prove the insured's activity at the time of impact. On the other hand, *Travelers Insurance Co. v. Warner*, 169 Colo. 391, 456 P.2d 732 (1969)

held exclusion from coverage of "any person ... serving as a member of a crew of ... an aircraft" posed a question of the insured's status during the whole flight, not merely his actions at the moment of impact. *Warner*, 456 P.2d at 734 defined a "crew" as "a company of two or more persons associated for the purpose of operating an aircraft between different points or during a certain time interval." Thus *Warner* excluded coverage of a person in a dual-control plane, where there was no actual proof of what that person was doing at the moment of impact.

■ In this Court's view, it is perhaps conceivable to read such active language as that in *Ulysses* and *Vander Laan* ("while piloting or serving" and "while operating or serving") in a narrow temporal sense—requiring proof of performance at the actual moment of impact. But any such reading strains common sense about as far as it can go. Connecticut General's policy language ("travel or flight in any aircraft while the Insured is a pilot or member of the crew....."), written in status terms, cannot fairly be stretched so far. It would be unreasonable to construe a clause written in such language to require actual performance of a duty at the moment of death. *Le Breton v. Penn Mutual Life Insurance Co.*, 223 La. 984, 67 So.2d 565, 570 (1953); see also *Beckwith v. American Home Assurance Co.*, 565 F.Supp. 458, 461–62 (W.D.N.C.1983) (rejecting the *Vander Laan* "moment of impact" test and holding a person who at some point during the flight had piloted the plane did not become a "passenger" when another person took over the controls). Otherwise a pilot or a crew member would be included in or excluded from coverage on a moment-to-moment basis during each flight, according to what he or she happened to be doing. And given the real-world context of small-aircraft fatal crashes, with the almost universal impossibility of eyewitness testimony as to an insured's moment-of-crash conduct, such a rule would effectively read the exclusion right out of the policy. That is

just not a common-sense or fair reading of the Connecticut General policy.

Although neither litigant has focused at all on the remaining language of exclusion clause (g) (no doubt because it does not apply directly to the circumstances of the Keysers' flight), that language is also strongly corroborative of the reading this opinion has given to the critical provision. Clause (g) also excludes from coverage "travel or flight in any aircraft ... while the aircraft is operated for aviation training or experimental purpose." It would be a truly odd construction to read that provision as hinging coverage on the activity at the precise moment of the crash (again such activity is a fact that the insurer, in drafting the policy, would have had to anticipate as unknowable in virtually every case of accidental death due to an airplane crash), as distinct from the *general* purpose of the flight. Once again it is abundantly clear the focus of the clause is on the first phrase ("travel or flight in any aircraft") in the sense of the insured's being on such a flight, rather than on any temporal moment-of-crash determination. That too bespeaks a "status" question, and under principles of parallel construction it confirms the same meaning to be ascribed to the clause involved in the present dispute.

All of this compels the conclusion that the exclusionary clause is not ambiguous in terms of its looking to the status of the insured during the flight rather than his actions at the moment of the fatal crash. That means unless some ambiguity in the terms "a pilot or member of the crew" forces the latter question to a jury determination, the application of those terms to a given set of facts is a matter of law. *National Tea Co. v. Commerce & Industry Insurance Co.*, 119 Ill.App.3d 195, 199–200,

74 Ill.Dec. 704, 708, 456 N.E.2d 206, 210 (1st Dist.1983). It only remains to be considered, then, whether a "genuine issue of material fact" exists as to John Jr.'s status as "a pilot or member of the crew" on the Pitts.

For its purposes the Federal Aviation Administration ("FAA") has defined "crewmember" as "a person assigned to perform duty in an aircraft during flight time." 14 C.F.R. § 1.1. "Pilot" is not defined in the regulations, but "pilot in command" means "the pilot responsible for the operation and safety of an aircraft during flight time." *Id.* That definition is significant because a private pilot may log time as a "pilot in command" only when he or she is the "sole manipulator of the controls of an aircraft for which he is rated." 14 C.F.R. § 61.-51(c)(2).

While not determinative of this contractual dispute, those definitions offer guidance as to the usage of such terms in the aeronautics industry. If John Jr. were at the controls of the Pitts at any time during its flight, he unquestionably had duties on that aircraft "during flight time," thus bringing him within FAA's conception of "crewmember" (indeed, in a two-seater aircraft with dual controls, he would be the "pilot in command" during that part of the flight). Alternatively, if John Sr. were at the controls and John Jr. performed any duties at his direction, he would also be a "crewmember" in this sense. See also *Warner*, 456 P.2d at 734 (defining crew member as "a company of two or more persons associated for the purpose of operating an aircraft between different points or during a certain time interval").

Even though a small plane like the Pitts cannot be said to have a "crew" in the manner of a jet airliner,[6] on the facts as

---

**6.** It is relevant that 14 C.F.R. § 91.7 employs the term "required flight crewmember" in mandating such personnel remain at assigned stations "unless his absence is necessary in the performance of his duties in connection with the opera-tion of the aircraft or in connection with his physiological needs" and in mandating such personnel wear shoulder harnesses during takeoff and landing unless he would be "unable to perform his required duties with the shoulder har-

presented it would be totally unreasonable for any trier of fact to infer that John Jr. neither served as pilot at the controls nor carried out any functions at the direction of John Sr. if and when John Sr. was at the controls (the latter itself representing an attenuated inference). It must be remembered a summary judgment motion compels only reasonable inferences, not unduly strained ones. *Hermes*, 742 F.2d at 353.[7]

■ There is thus no doubt—even in inferential terms—that John Jr., if not actually at the controls at the moment of impact, was "a pilot or member of the crew" of the Pitts, or both, during its flight on August 20, 1983. And it is implicit in this analysis that the contractual language presents no ambiguity in its application to the present situation, so that the issue is one of law for this Court, not one of fact for a jury. Were John Jr. neither "a pilot" nor "a member of the crew," that would leave open only status as a mere passenger, and no reading of the facts, however favorably to Mrs. Keyser, sensibly supports this position.

*Warner*, 456 P.2d at 734 also pointed to the insured's ownership of the plane and operation of the radio during the flight as bringing him within the common conception of a crew member. Those factors (and more) apply to John Jr. as well. True enough, the combination of his opportunity and his right (as owner) to operate the plane might not necessarily create a presumption of operation—of his being the "pilot." But once again the "pilot" is only part of the inquiry. Even were John Jr.

not the pilot at any point during the flight (and, it must be repeated, whatever evidence exists renders his having piloted the aircraft during the flight the far more likely circumstance), he was at a minimum engaged in activities that have led courts to categorize decedents as "crew members." Other factors that might be relevant—who filed the flight plan, who received clearance for take-off and who radioed for help—are simply inapplicable in this case, for none of those things was done. Their absence from consideration does not show there was no crew in the common sense of the term under the circumstances of this flight.[8]

■ Finally, it is worth noting John Jr.'s activity in the Pitts on the day of the crash is precisely the sort of extra-risk position the policy's exclusionary clause must have been intended to exclude. Although questions of intent in contract construction are generally for the jury, *Fitzsimmons v. Best*, 528 F.2d 692, 694 (7th Cir.1976) (per curiam), Mrs. Keyser has raised no factual issue as to the intent of the parties, nor does she present any facts from which a trier of fact might infer John Jr.'s role on the flight was wholly and purposely passive. Indeed, every reasonable inference is otherwise. He sat in the rear—or "pilot's" —seat, which had the ignition switch, he was active on the radio, and the only suggestion as to the itinerary (to go to Racine) was his. Though the exclusionary clause might perhaps have been more specific or detailed, no triable issue of fact is raised by the briefs or affidavits as to the parties' intent.

---

ness fastened." That concept of situations in which a "crewmember" other than the pilot is "required" confirms the text's common-sense reading of the "crewmember" concept alone as one extending beyond the flight-crew situation of large aircraft to the kind of plane and situation presented here.

7. This opinion has already discussed in detail, in the context of Mrs. Keyser's motion, the strength of the inference that John Jr. piloted the Pitts. Indeed, to focus on only the very

beginning of the flight, it seems virtually inescapable that, because the ignition switch was at John Jr.'s seat, he either piloted the plane from the runway or started it up at John Sr.'s direction.

8. Once again it should be stressed that "crew member" status is only one string to Connecticut General's bow. Whether on that basis or as "pilot," John Jr. is plainly excluded from coverage as a matter of law.

*Conclusion*

Mrs. Keyser's motion for summary judgment is denied. Even on Mrs. Keyser's own impermissibly narrow approach, addressing only the "pilot" question as of the time of impact (and ignoring entirely the policy's "member of the crew" language), there is at least a material issue of fact on that score.

When the entire exclusionary clause and its fair meaning are taken into account, any material fact issue vanishes. Though there are some factual uncertainties, they are not "outcome-determinative," *Big O*, 741 F.2d at 163. As a matter of law John Jr. was either "a pilot" or a "member of the crew" of the Pitts airplane during its fatal flight, so that the policy's exclusionary clause bars coverage. There is thus no genuine issue of material fact, and Connecticut General is entitled to a judgment as a matter of law. This action is dismissed with prejudice.