No. 47,357

MARTIN BAUGHER and H. R. KROKSTROM, partners, d/b/a Chanute Livestock Auction, *Appellees,* v. HARTFORD FIRE INSURANCE COMPANY, a corporation, *Appellant.*

(522 P. 2d 401)

Opinion filed May 11, 1974.

*Charles F. Forsyth,* of Erie, argued the cause, and *Richard L. Ashley,* of Chanute, and *Clark M. Fleming,* of Erie, were with him on the brief for the appellant.

*Robert Pennington,* of Chanute, argued the cause, and *Charles E. Henshall,* of Chanute, was with him on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action on an insurance policy to recover for loss of cattle due to theft. The action was tried to a jury in the district court of Neosho County and resulted in a verdict for the plaintiffs. Appeal has been duly perfected by the defendant.

The underlying issue in the case concerns the construction of the provisions of the insurance policy covering theft, the appellant contending the plaintiffs' evidence established only a mysterious disappearance of the cattle for which there was no coverage under the policy.

Martin Baugher and H. R. Krokstrom, Sr., are partners, d/b/a Chanute Livestock Auction (plaintiffs-appellees), and operate a livestock auction business east of the city limits of Chanute, Neosho County, Kansas. In connection with the operation of their business livestock is delivered to their place and kept until sold on a subsequent sale date in the regular course of business.

The Hartford Fire Insurance Company, a corporation, (defendant-appellant) on the 17th day of February, 1966, issued a policy of insurance to the appellees which was designated: "Livestock Auction Market Form-Yard Cover-Combined Coverages". The policy was continued in force by the payment of premiums therefore on the part of the appellees and was in full force and effect at all times herein material.

The provisions of the policy material to this action read:

"*This policy shall also cover loss due* to the death of live stock insured hereunder directly resulting from hail, and direct loss or damage to live stock insured hereunder caused by electrocution, including loss by electrocution resulting from electrical currents which are artificially generated, explosion, riot, riot attending strike, civil commotion, falling aircraft and objects falling therefrom, and *theft; it being specifically understood that the word 'theft' shall mean an act of stealing and shall not include mysterious disappearance, shortage, nor any occurrence where there has been a voluntary surrender of the live stock,* with the specific understanding and agreement that this Company shall not be liable for any theft loss or damage except where the theft occurs while the live stock is on the premises described herein, nor where there is involved either as principal or an accessory to the theft any owner of the premises from which the animals are stolen or any partner, member or employee of such owner; nor where there is involved either as principal or accessory any person having custody or control of the animals at the time of the theft or any partner, member, employee or bailee of such person or organization having custody or control of the animals." (Emphasis added.)

The petition alleged that on or about the 29th day of January, 1970, at the auction premises described the appellees suffered the loss, through theft, under the terms of the policy described, of two black steers, two black heifers and one white-face heifer of the aggregate value of $707.29.

The petition also alleged that on or about the 7th day of July, 1970, at the auction premises the appellees suffered the loss, through theft, under the terms of the policy, of nineteen head of cattle of the aggregate value $3,162.10.

The petition further alleged in each instance to the notice of such loss and theft was promptly given to the appellant and written claim for such loss was made under the terms of the policy, but the appellant failed, neglected and refused to pay the claim.

The appellant answered alleging among other things that the petition fails to state any actionable cause against the appellant, and,

"That Plaintiffs at no time in support of their claims have provided this Defendant with any reasonably conclusive evidence that any loss they may have sustained was the result of a theft rather than of a mysterious disappearance, shortage, or other cause."

The appellees' claims for attorney fees and for punitive damages were disposed of by the trial court and are not the subject of appeal to this court.

At the pre-trial conference a copy of the insurance policy was admitted as an exhibit. It was agreed the interpretation of the

policy was for the court, and that the policy would not be submitted to the jury as a trial exhibit. Counsel also stated that the loss of the cattle and the value of such cattle could be stipulated. The appellant however, did not agree that the nineteen head of cattle lost on or about the 7th day of July, 1970, were delivered to Chanute or that they were stolen. There was no agreement concerning the five head of cattle alleged to have been lost on or about the 29th day of January, 1970.

Hillis Krokstrom, Sr., testified that he was one of the partners in the Chanute Livestock Auction. He testified concerning the manner in which the premises were built and the procedure in getting the cattle in and out of the pens. He identified plats and photographs of the various pens and alleys in the sales barn area. According to his testimony, on Thursday, January 29, 1970, they had a large sale and it was necessary to use some of the hog pens in the eastern portion of the yard for cattle. Normally cattle are penned in the western portion of the yard. He explained the process by which the cattle were identified after being brought to the yards for sale, by tagging them with a number on a piece of light cardboard which is pasted on the right or left hip of the animal. The identity of the animal is thereby followed through the auction ring to the highest bidder, weighed and penned in accordance with the identity of the bidder to keep the bidder's cattle together for simplification in loading out after the sale. After the sale that day a large semi-trailer truck was backed up to one of the hog docks loading hogs, obscuring his vision from the office to the hog dock on the other side of the truck. An employee, Don Buster, was on duty at the hog dock but reported to Mr. Krokstrom that he had left the area to go to the west side of the yard to assist in loading cattle for a period of about fifteen minutes. Five head of cattle, identified by number and weight, were discovered shortly thereafter to be missing from the hog pen area where they had been penned with other calves. He testified that the missing five head of cattle could have been loaded out from the hog dock in five minutes time. All other pens were checked and the five head were never located or found. The sheriff, State Brand Inspector, and the Kansas Bureau of Investigation were notified. These agencies made an investigation but to his knowledge they were never able to locate the five head.

The employee, Don Buster, who was at work at the time the

five cattle were discovered missing, said he was not in the area from which they were apparently taken; that sometimes people did take the wrong cattle, but usually they brought them back. He personally did not know about any five head of cattle missing until he was told.

Mr. Krokstrom further testified that on the Friday before July 6, 1970, he bought 34 head of cattle at Siloam Springs, Arkansas. On the 6th day of July, 1970, he was in Decatur, Arkansas, and purchased an additional 104 head of cattle at the sale there. He had left the 34 head at Siloam Springs until July 6th and contracted with the Bud Edwards Truck Line to pick up the 34 head at Siloam Springs and bring them to Decatur, Arkansas, to load with the cattle purchased at Decatur for delivery to Chanute, Kansas. He had done business with Bud Edwards for about twelve or fourteen years. He instructed Mr. Edwards in the loading and unloading of the cattle, and specifically instructed Mr. Edwards to keep the 34 head separate. The cattle were to be delivered at the Chanute Livestock Auction later that night. He instructed that the other 104 head be placed in three other pens at Chanute. His previous experience with Bud Edwards had been very good and he had never had any shortage. He left the loading of the cattle up to Mr. Edwards, and he did not see the cattle loaded or count them when they were loaded either in Decatur or Siloam Springs.

Bud Edwards testified that he was instructed in accordance with the testimony heretofore given by Mr. Krokstrom to keep the 34 head of cattle separate that were picked up at Siloam Springs, Arkansas. With the help of the two drivers he sorted and loaded all of the cattle onto two trucks. He counted the cattle and gave ·instructions to the drivers just as they were given to him by Mr. Krokstrom. The two trucks left Decatur at a little before 8:00 p. m. He identified the drivers as Gail Bemis and Red Wright. Bemis had driven for him about two weeks prior to the incident of July 6, 1970, and worked the balance of the week and then went "swishhh". He did not know where Mr. Bemis was at the time of trial. Mr. Wright had been employed by him for three or four years and Mr. Edwards found him to be an honest and reliable employee. The drivers returned to the truck terminal at Rogers, Arkansas, sometime before 6:30 a. m. the next morning, July 7, 1970, and left the trucks at the terminal. Later that morning Mr. Edwards had a telephone call from Mr. Krokstrom reporting nineteen head of cattle missing.

Mr. Edwards further testified that the trip from Decatur, Arkansas, to Chanute, Kansas, with the trucks which his drivers were driving would take about three and one-half to four hours. He said it was customary to deliver cattle at night and not unusual to deliver cattle when there was no one around to receive them.

One of the truck drivers, T. W. Wright, testified concerning the delivery of the cattle to Chanute on the night of July 6, 1970. He said he went to the Decatur sale and after the sale loaded cattle purchased by Mr. Krokstrom at Decatur as well as 34 head which had come from Siloam Springs. He said Bud Edwards was there at the time and supervised the loading of the cattle and the sorting of the cattle into the compartments on the two trucks. Mr. Wright counted the cattle before he started loading but did not remember exactly how many there were from Decatur. He did recall that there were 34 head from Siloam Springs. He had the health papers on the cattle and acknowledged Mr. Edwards gave him instructions concerning the delivery and the penning of the cattle, and the penning of the 34 head separately in one pen when delivered in Chanute. He said the cattle were loaded and were checked against sale tickets by Mr. Edwards as they were loaded. According to Mr. Wright the two trucks left Decatur about 7:30 p. m.

Mr. Wright testified that he had been to Chanute previously but understood that Mr. Bemis had not been to Chanute, so Mr. Wright drove the lead truck and Mr. Bemis driving the other followed all the way to Chanute. They stopped at the Kansas Port of Entry and both trucks went through the Port of Entry at the same time. Both trucks left the Port of Entry together and traveled together to Johnson's Truck Stop near Erie, Kansas, where the drivers checked the cattle and had a cup of coffee. They were there about fifteen or twenty minutes. They then proceeded to the Chanute sales barn, arriving there sometime between 11:00 and 12:00 o'clock that night. Mr. Wright said he unloaded his truck first, with the other driver assisting and then the other truck was unloaded with Mr. Wright assisting. According to Mr. Wright's testimony there were lights on in the cattle dock and cattle pen area where the unloading and penning were done. They saw no one else at the sales barn premises. There were no other cattle in the pens, and when he unloaded his truck the other driver was counting. When the other truck was unloaded the witness was counting. They penned 34 head which had come from Siloam Springs in a separate pen, and the other

cattle which were purchased at Decatur in other pens. The count on the cattle unloaded checked out according to Mr. Wright. Neither he nor the other driver made any other stops. He testified that he did not take any cattle off of his truck prior to reaching Chanute and the other driver could not have stopped and taken any cattle off of the other truck. When they left the Chanute sales barn the gates were all closed and latched. As the drivers left the Chanute sales barn, he saw nothing unusual, but he did see a truck parked on the other side of the office by the hog chute as he drove out after unloading. When the cattle were unloaded at Chanute, Mr. Wright left the health papers and invoice papers fastened on the pens with a wire. Later that morning, he received a telephone call from Mr. Edwards reporting the loss of the cattle which had been reported to him by Mr. Krokstrom. He said there was nothing unusual about unloading cattle at night as they did at Chanute.

On cross-examination Mr. Wright testified that if there were any cattle missing at Chanute, he did not know what happened to them.

Officials who were notified of the loss of cattle on above dates at the Chanute sales barn were all called to testify. In the course of their investigation they never turned up any evidence as to what happened to the five head of cattle on the one occasion and the nineteen head of cattle on the other occasion.

The agent for the Hartford Insurance Company, Edwin H. Bideau, testified he wrote the policy in question and that the Chanute Livestock Auction had reported the above losses of the cattle.

The jury found the appellees were entitled to recover for the loss of cattle on each of the occasions and the amount of the loss was set at $707.29 for the five head of cattle and $3,123.10 for the nineteen head of cattle. Judgment was entered upon the verdict for the total sum of $3,830.39 together with interest thereon from the date of judgment.

Thereafter the appellant's motion for a directed verdict notwithstanding the general verdict and the appellant's motion for a new trial were overruled.

The appellant contends the trial court erred as a matter of law in construing the insurance policy, specifically the provisions above quoted concerning the term "theft".

The trial court's construction of the provisions of the policy in question is reflected in the instructions given to the jury. On this

point the appellant attacks instruction No. 13 and 14. These instructions read:

"No. 13

"Plaintiffs have two separate claims for cattle alleged to have been stolen on two different occasions.

"The first claim is that on or about January 29, 1970, two black steers, two black heifers, and one whiteface heifer, were stolen from plaintiffs' premises, and that they were worth a total of $707.29.

"Defendant has denied plaintiffs' claim and the burden of proof is upon plaintiffs to prove the following:

"1. That the cattle were stolen from plaintiffs' premises on or about January 29, 1970; and

"2. If the cattle were so stolen, what their value was at the time of the theft.

"The second claim is that on or about July 7, 1970, nineteen head of cattle were stolen from the plaintiffs' premises, and that they were worth a total of $3,123.10.

"Defendant has agreed that plaintiffs purchased the cattle in Arkansas and that their value was $3,123.10, but defendant does not agree that they were delivered to Chanute and denies that they were stolen. Therefore, the burden of proof is upon plaintiffs to prove that these cattle were stolen from plaintiffs' premises on or about July 7, 1970.

"No. 14

"You have been told that in order for plaintiffs to obtain a verdict in their favor, they must prove that the cattle were stolen, that is, that there was a theft. You have also been told, in Instruction No. 9, the standard of proof which you are to apply to the evidence.

"The word theft, or 'stolen,' as applied to this case, means that plaintiffs must prove that somebody took the cattle without authority and with the intent to deprive the owners permanently of the use and benefit of the property. If you do find that the property was stolen it is not necessary that plaintiffs prove who did it.

"As is true of all the other instructions which I am giving you, you will apply these rules separately to the two claims of plaintiffs."

The trial court also gave a circumstantial evidence instruction. The contention of the appellant is stated in its brief as follows:

". . . The court simply required the plaintiff prove that the cattle were stolen and specifically stated that it was not necessary to prove who did it and nowhere instructs on the elements of mysterious disappearance or shortage.

"This as a matter of law is directly contrary to contract and under K. S. A. 60-251 (*b*) there was not even a need to object to such instructions, although appellant's counsel did object to submitting any instructions to the jury. . . ."

The appellant concedes it is the duty of the court to construe the insurance policy and leave only questions of fact for the jury

to determine. But it is argued where the insurance policy, as here, is not ambiguous and does not contravene public policy, the insured must prove that the loss comes within the coverage of the policy of insurance. To do so, it is contended, the insured would have to show something more than mysterious disappearance, and would have to show that none of the employees of the Chanute Livestock Auction, its agents, bailees or persons having charge of the cattle had anything to do with the theft of the cattle. It is argued the court cannot make another contract for the parties; that its function is to enforce the contract as made. (Citing, *Clark v. Prudential Ins. Co.*, 204 Kan. 487, 464 P. 2d 253; and *Braly v. Commercial Casualty Ins. Co.*, 170 Kan. 531, 227 P. 2d 571.)

Whether the first three points asserted by the appellant have merit is dependent upon the action taken by counsel for the appellant in the trial court.

The appellant participated in the pre-trial conference. There it was agreed the interpretation of the policy of insurance was for the court and not the jury. It was further agreed the policy would not be submitted to the jury as a trial exhibit. Therefore, the appellant is in no position on appeal to assert as error the failure of the trial court to submit the policy to the jury as a trial exhibit.

The pre-trial conference contemplated in K. S. A. 60-216 has become an important part of our procedural process designed, among other things, to acquaint each party in advance of trial with respect to the factual contentions of the parties upon matters in dispute, thus reducing the opportunity for maneuver and surprise at the trial, and enabling all parties to prepare in advance for trial. Orders entered at the pre-trial conference have the full force of other orders of the court and they control the subsequent course of the action, unless modified at the trial to prevent manifest injustice. (*Brown v. Hardin*, 197 Kan. 517, 419 P. 2d 912; *Evangelist v. Bellern Research Corporation*, 199 Kan. 638, 433 P. 2d 380; and *Freeto Construction Co. v. American Hoist & Derrick Co.*, 203 Kan. 741, 457 P. 2d 1.)

There is nothing in the record to indicate the appellant at the pre-trial conference made any request for the determination of issues other than those specifically set forth in the pre-trial order and the supplemental pre-trial order. Following entry of the pre-trial order and supplemental pre-trial order the appellant made no

objection, and made no request for modification or enlargement. Furthermore, there is nothing in the record to indicate that at the trial of the action the appellant made any objection to the procedure or the issues to be tried as defined by the pre-trial orders.

In due course at the close of evidence, the appellant having called as its only witness its insurance agent, the instructions prepared by the court were presented to counsel. The appellant neither requested any instructions nor objected to any of the instructions given by the court, which in effect construed the policy and defined the issues as set forth in the pre-trial orders and as developed by the evidence. The appellant in its motion for a new trial asserted no error concerning the instructions given by the court.

Under K. S. A. 60-251 (*b*) no party may assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection, unless the instruction is clearly erroneous. (*Bott v. Wendler,* 203 Kan. 212, 453 P. 2d 100.)

Were the trial court's instructions clearly erroneous as a matter of law? Under the circumstances presented by the record herein we think not.

It is a general rule that exceptions, limitations and exclusions to insuring agreements require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms. (*Krug v. Millers' Mutual Insurance Ass'n.,* 209 Kan. 111, 495 P. 2d 949, and cases cited therein.)

Touching the burden of proof, the well-established rule is that when an insurer seeks to avoid liability on the ground that the accident or injury for which compensation is demanded is covered by some specific exception to the general terms of the policy, the burden of proof rests upon the insurer to prove the facts which bring the case within such specified exception. (*Sears v. Insurance Co.,* 108 Kan. 516, 196 Pac. 235.)

The distinction between "coverage" provisions and exculpating or "exclusionary" clauses in an insurance contract is the decisive factor in determining which party has the burden of proof on an issue, where coverage under the policy is disputed. The assured

has the burden of proving that the loss was of a type included in the general coverage provisions of the insurance contract. (*Ruffalo's Truck Serv. v. National Ben-Franklin Ins. Co.*, 243 F. 2d 949 [1957].)

Apparently the trial court in construing the provisions of the policy here in question, with the acquiescence of the appellant in the trial court, determined the coverage provisions of the policy included theft of cattle from the premises. This the trial court defined to be an act of stealing as set forth in its instructions. The subsequent clause, after the semicolon in the policy provision heretofore quoted, that theft "shall not include mysterious disappearance, shortage, nor other occurrence where there has been a voluntary surrender of the livestock" was construed by the trial court as an exculpating or exclusionary clause in the policy. This is the theory upon which the case was tried and submitted to the jury by the court's instructions in the trial court. The appellant acquiesced in the presentation of the case on this theory throughout the trial proceedings. Points attacking the pre-trial orders and instructions given by the trial court are challenged for the first time on appeal, under a new theory which is asserted for the first time on appeal.

A party cannot on appeal be permitted to change its theory or raise new issues not previously presented to the trial court, or inconsistent with the position taken before the trial court. (*Mater v. Boese*, 213 Kan. 711, 518 P. 2d 482; and cases cited therein.)

With the case in this posture we are not called upon to construe the provisions of the policy to determine whether the trial court erred in its construction of the policy. The appellant is bound by the theory upon which the case was submitted in the trial court. Under the theory upon which the case was tried, the instructions given by the trial court were not clearly erroneous.

The last point asserted by the appellant is that the trial court erred in overruling its motion for a directed verdict at the close of the evidence because there was not sufficient evidence to submit the case to the jury.

Here the appellant argues there is actually no dispute as to the facts. It is stated that every witness for the insured simply stated that there was never any indication as to what happened to the cattle except that they were missing.

The mysterious disappearance of hogs for which recovery was sought under a contract of insurance was before the Nebraska Supreme Court in *Raff v. Farm Bureau Ins. Co.*, 181 Neb. 444, 149

N. W. 2d 52 (1967). There provisions of the policy material to the risk were that: " '(*f*) Theft and overturn. This insurance is extended to include direct loss by theft (but excluding escape, mysterious disappearance, inventory shortages, wrongful conversion and embezzlement), and overturn. . . .' " The evidence disclosed the hogs had strayed or escaped from the insured's cornfield and were found by a neighbor on his land. Thinking the hogs belonged to another neighbor, he called him to report the presence of the hogs on his farm, and the other neighbor drove them to a point near his premises when he determined they were not his hogs, and he abandoned them near a bridge. There was testimony by the sheriff that the hogs were not on the neighbor's farm and that he could find no evidence that the missing hogs had been sold. Two hogs returned one week after they had strayed away. The court held as a matter of law that the evidence was insufficient to support a finding that the hogs were stolen, and the loss of the hogs was held not within the theft provision of the policy. In the opinion the court defined "mysterious disappearance" under the terms of the theft policy "as disappearance under unknown, puzzling, and baffling circumstances which arouse wonder, curiosity, or speculation, or under circumstances which are difficult or hard to explain."

Affirmative proof of theft, or the elements necessary to prove the claim, may be made by circumstantial evidence. (*Ferguson v. Phoenix Assurance Co.*, 189 Kan. 459, 370 P. 2d 379, 99 A. L. R. 2d 118; and see 169 A. L. R. 220, at page 233). Here the proof of loss consisted of circumstantial evidence of theft. When the evidence presented by the appellees in this case is compared with the circumstantial evidence presented in the *Raff* case, where the neighbors involved were not even called to testify, it is readily apparent a much stronger case of theft is presented.

The appellant argues:

". . . There was testimony that the cattle could have been taken by mistake and there was testimony which indicated that one or more of the employees could have been involved in a theft. There were highly suspicious circumstances that a truck driver who only worked two weeks, finished out the week after delivering the cattle, and then disappeared. . . ."

The appellant's statement that one or more of the employees of the appellees could have been involved in the theft is not supported by evidence in the record. An attempt was made to raise this point by creating an inference on cross-examination of

appellees' witnesses. This argument turns upon whose responsibility it was to sustain the burden of proof. The theory upon which this case was tried cast the burden upon the appellant and it produced no evidence to support such defense.

A careful review of the testimony of the various witnesses presented by the appellees in this case indicates there was not one scintilla of evidence that the appellees' employees stole the cattle. The appellant called only one witness, the agent for the appellant, who testified as to the report made of the losses by the appellees. He said he had no reason to believe that any claim submitted by Mr. Krokstrom was falsified in any way.

The appellant simply argues that some event could have happened bringing into play policy defenses, even though the appellant presented no evidence to establish mysterious disappearance, shortage, nor any occurrence to indicate there may have been a voluntary surrender of the livestock.

Although the proof of theft in this case is supported only by circumstantial evidence, the evidence is sufficient, if given credence by a jury, to give rise to a fair and indeed almost an inescapable inference that the cattle were stolen from the premises of the appellees within the meaning of the term "theft" under the policy of insurance issued by the appellant.

The evidence established the loss of the five head of cattle on January 29, 1970, to have occurred within a fifteen minute period shortly after a big sale when many persons and trucks were present. They were missing from a pen at the hog dock where vision was obscured by another truck, while the attendant left to assist at the other side of the yard in loading cattle. Only five head were taken from a pen at the loading dock, leaving other cattle in the same pen so that a count would be necessary to determine the loss. A purchaser whose cattle were penned together for ease in loading would surely take all of his cattle in loading them out of the sales premises. All of the evidence concerning the five head missing points to theft as defined by the court in its instructions.

Theft of the nineteen head of cattle lost on the 7th day of July, 1970, is also supported by the circumstantial evidence. The evidence of delivery, if believed by the jury, places 34 head penned separately on the appellees' premises on the night of delivery. The following morning a calf belonging to one of the cows, identified

as being among the nineteen head missing and penned with the 34 head, was running loose in an alley. Again only a portion of all the cattle in the pen were missing, thus requiring a count to establish the loss.

If the appellees were required to prove who stole the cattle to establish proof of loss under the policy, there would be no need for insurance. The appellees could pursue the cattle and recover them. The substantial premium paid for a policy of this type would have been for naught.

Upon the issues submitted to the jury under the instructions, there was sufficient evidence in the record to support the jury's findings that the loss of the appellees' cattle on each occasion was the result of theft within the meaning of the policy of insurance covering loss by theft.

The judgment of the lower court is affirmed.