Louis DRONGE, Plaintiff,

v.

The MONARCH INSURANCE COMPA-
NY OF OHIO, Defendant,

and

United Jersey Bank, Intervenor.

No. 76–17–C6.

United States District Court,
D. Kansas.

Jan. 10, 1979.

Lee Thompson, Martin, Pringle, Schell & Fair, Wichita, Kan., for plaintiff.

Fred C. Begy, III, Lord, Bissell & Brook, Chicago, Ill., for defendant.

Alvin D. Herrington, McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, Kan., for United Jersey Bank, intervenor.

## MEMORANDUM OF DECISION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WESLEY E. BROWN, District Judge.

This is a contract action in which the plaintiff, Louis Dronge [Dronge], seeks to recover the sum of $183,000 allegedly due and owing upon a contract of insurance issued by defendant Monarch Insurance Company [Monarch]. The subject of the insurance contract, which was issued on August 15, 1974, was a 1974 Cessna 402B aircraft [the 402B], owned by plaintiff Dronge. This aircraft crashed in Sedgwick County, Kansas, on February 19, 1975, and thereafter was sold for salvage. At the time of the crash, the aircraft was carrying a cargo of marijuana and criminal prosecutions were undertaken against the two persons piloting the craft, Charles Alexander Pappas [Pappas] and Edward Kelley [Kelley]. In addition to the $183,000 together with all interest accrued thereon from February 19, 1975, plaintiff seeks an allowance of reasonable attorney fees and expenses incurred as a result of the litigation, and for the costs of this action. Defendant seeks rescission of the insurance agreement and its damages for defending the litigation. Trial was had to the Court on October 31 and November 1, 1978. Joint stipulations are on file, all briefs and arguments have been presented, and the case is ready for disposition.

4

■ Because this case involves construction of a contract of insurance, a general discussion of the law is appropriate. General law in Kansas is clear as to the construction of insurance policies. A recent statement of Kansas law is found in *Mah v. United States Fire Ins. Co.*, 218 Kan. 583, 545 P.2d 366 (1976). The law provides that in construing an insurance policy, a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose to be accomplished. Policies must be construed according to the sense and meaning of the terms used, and if the language is clear and unambiguous, it must be taken in its plain, ordinary and popular sense. *Mah, supra; Bramlett v. State Farm Mutual Ins. Co.*, 205 Kan. 128, 468 P.2d 157 (1970). When an insurance contract is not ambiguous, a court may not make another contract for the parties. An unambiguous contract must be enforced according to its terms. *Mah, supra; Goforth v. Franklin Life Ins. Co.*, 202 Kan. 413, 449 P.2d 477 (1969); *Simpson v. KFB Insurance Co., Inc.*, 209 Kan. 620, 498 P.2d 71 (1972).

■ However, a contract of insurance may be ambiguous. To be ambiguous the contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves one genuinely uncertain which one of two or more meanings is the proper meaning. *Mah, supra; Clark v. Prudential Ins. Co.*, 204 Kan. 487, 464 P.2d 253 (1970); *Western Casualty & Surety Co. v. Budig*, 213 Kan. 517, 516 P.2d 939 (1973). Where the terms of a policy of insurance are ambiguous or uncertain, conflicting or susceptible of more than one construction, the construction most favorable to the insured must prevail. *Mah, supra; Goforth v. Franklin Life Ins. Co., supra*. This is because an insurance contract is by nature an adhesion contract. *Gowing v. Great Plains Mutual Ins. Co.*, 207 Kan. 78, 483 P.2d 1072 (1971).

■ The language of a policy of insurance, like any other contract, must, if possible, be construed in such manner as to give effect to the intention of the parties. *Mah, supra; Goforth, supra*. In determining the intention of the parties to a contract of insurance, the test is not what the insurer intends the printed language to mean, but rather what a reasonable person placed in the position of the insured would have understood the words to mean. *Fancher v. Carson-Campbell, Inc.*, 216 Kan. 141, 530 P.2d 1225 (1975); *Gowing v. Great Plains Mutual Ins. Co., supra; Walker v. Imperial Casualty & Indemnity Co.*, 1 Kan.App.2d 349, 564 P.2d 588 (1977). Since the insurer prepares its own contracts, it has a duty to make the meaning clear. If the insurer intends to restrict or limit coverage provided in the policy, it must use clear and unambiguous language in doing so, employing such language as will clearly and distinctly reveal its stated purpose. *Fancher v. Carson-Campbell, Inc., supra; Gowing, supra; Goforth, supra*. This rule of construction applies with particular force to provisions which attempt to exclude liability coverage under certain conditions. *Gowing, supra*, citing *Prickett v. Hawkeye-Security Insurance Company*, 282 F.2d 294 (10th Cir. 1969). It is a general rule that exceptions, limitations and exclusions to insuring agreements require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms. *Krug v. Millers' Mutual Insurance Ass'n*, 209 Kan. 111, 495 P.2d 949 (1972). *See generally Alliance Life Ins. Co. v. Ulysses Volunteer Fireman's Relief Assn.*, 215 Kan. 937, 529 P.2d 171 (1974); *Fowler v. United Equitable Ins. Co.*, 200 Kan. 632, 438 P.2d 46 (1968); *Wise v. Westchester Fire Ins. Co.*, 463 F.2d 386 (10th Cir. 1972).

■ As to the burden of proof, the well-established rule is that when an insurer

seeks to avoid liability on the ground that the accident or injury for which compensation is demanded is covered by some specific exception to the general terms of the policy, the burden of proof rests upon the insurer to prove the facts which bring the case within such specific exception. The burden is on the insured to prove that the loss was of a type included in the general coverage provisions of the insurance contract. Thus, the distinction between "coverage" provisions and exculpating or "exclusionary" clauses in an insurance contract is the decisive factor in determining which party has the burden of proof on an issue, where coverage under the policy is disputed. *Baugher v. Hartford Fire Ins. Co.*, 214 Kan. 891, 522 P.2d 401 (1974); *Krug v. Millers' Mutual Insurance Ass'n, supra.*

■ Plaintiff seeks attorney fees. Any entitlement which plaintiff may have to attorney fees is that provided by K.S.A. 40–256:

40–256. Attorney fees in action on insurance policies; exception. That in all actions hereafter commenced, in which judgment is rendered against any insurance company . . ., if it appear from the evidence that such company . . . has refused without just cause or excuse to pay the full amount of such loss, the court in rendering judgment shall allow the plaintiff a reasonable sum as an attorney's fee for services in such action, including proceeding upon appeal, to be recovered and collected as a part of the costs: *Provided, however,* That when a tender is made by such insurance company . . . before the commencement of the action in which judgment is rendered and the amount recovered is not in excess of such tender no such costs shall be allowed.

It is clearly established under Kansas law that whether or not attorney's fees shall be allowed depends on the facts and circumstances of each particular case. *Van Hoozer v. Farmers Insurance Exchange*, 219 Kan. 595, 549 P.2d 1354 (1976); *Forrester v. State Farm Mutual Automobile Ins. Co.*, 213 Kan. 442, 517 P.2d 173 (1973); *Lord v. State Automobile & Casualty Underwriters,* 208 Kan. 227, 491 P.2d 917 (1971). *Covill v. Phillips*, 455 F.Supp. 485, 487–488 (D.Kan. 1978), sets out the Court's function:

It is a question for the district court as the trier of the facts to determine whether an insurance company has refused to pay the full amount of an insured's loss "without just cause or excuse," thereby subjecting itself to payment of an attorney's fee under K.S.A. § 40–256. *Koch, Administratrix v. Prudential Ins. Co.*, 205 Kan. 561, 470 P.2d 756 (1970). In this regard, it is the insurer's activity or lack thereof *prior to* commencement of the action which determines whether or not a refusal to pay is without just cause or excuse. *Sloan v. Employers Casualty Ins. Co.*, 214 Kan. 443, 521 P.2d 249 (1974). Whether there was any reasonable ground for contesting the claim depends upon circumstances existing when payment is withheld or liability is declined, and is not determined by the outcome of the ensuing litigation. *Wolf v. Mutual Benefit Health & Accident Ass'n*, 188 Kan. 694, 366 P.2d 219 (1961).

■ Several Kansas cases deal with which circumstances do and do not justify an award of attorney's fees. Where there was a good faith legal controversy, although the insurance company was wrong, the misconception on which it based its refusal was not such that would indicate an arbitrary, capricious, or bad faith motive. *Van Hoozer v. Farmers Insurance Exchange, supra.* This is particularly true when the legal controversy involves a first impression interpretation of a statute or legal principle. *Id.; Farm Bureau Mutual Ins. Co. v. Carr*, 215 Kan. 591, 528 P.2d 134 (1974); *Forrester v. State Farm Mutual Automobile Ins. Co., supra; Sturdy v. Allied Mutual Ins. Co.*, 203 Kan. 783, 457 P.2d 34 (1969). However, a company has a duty to make a good faith investigation of the facts before finally refusing to pay. When it makes no effort to investigate, either by itself or its counsel, but leaves the burden of investigation to the insured, the company does not have just cause or excuse for refusing to pay. *Lord v. State Automobile & Casualty Underwriters, supra.*

Monarch urges that the policy is subject to rescission, an equitable relief, based on false and misleading representations by the insured or his agents when the policy and/or the endorsements thereto were entered into. Under Kansas law, a policy is not subject to rescission absent fraud or bad faith. *Schneider v. Washington National Ins. Co.*, 200 Kan. 380, 437 P.2d 798 (1968). Misrepresentation is defined in 7 *Couch on Insurance* § 35:4, at 11–12:

> [A] misrepresentation in insurance is an oral or written statement, made by the insured or his authorized agent to the insurer or his authorized agent, of something as a fact which is untrue, is known to be untrue, and is stated with intent, or has a tendency, to mislead or deceive, or which is stated positively as true without its being known to be true, and which has a tendency to mislead, such statement relating in every case to material facts. A misrepresentation is a false representation of a material fact tending directly to induce the making of the contract. In other words a misrepresentation is a statement of something as a fact which is untrue and material to the risk, and which the insured states, knowing it to be untrue, in an attempt to deceive, or which he states positively is true, without knowing it to be true, and which has a tendency to mislead.

Couch states that avoidance of the policy is proper when there has been fraudulent misrepresentation, that is, an intentionally false, material misrepresentation, calculated to mislead the insurer into issuing the policy. 7 *Couch on Insurance* 2d §§ 35:108 and 35:109. *Schneider v. Washington, supra,* defined materiality under K.S.A. 40–2205, which deals with individual accident or sickness insurance policies.

> Generally the test of materiality under a statute, such as ours, is whether the misrepresentation could reasonably be considered to be material in affecting the insurer's decisions as to whether or not to enter into the contract in estimating the degree or character of the risk, or in fixing the premium rate thereon. *Id.* at 397, 437 P.2d 798.

This action does not involve an accident or sickness insurance policy, and thus *Schneider* is not directly on point. However, we may take the materiality test as an indication how the Kansas courts look at materiality generally. Of course, it is clear that some sort of misrepresentation must be found before we consider whether the misrepresentation was material.

### FINDINGS OF FACT

1. Plaintiff, Louis Dronge, is the named insured and was issued the insurance policy of defendant designated Monarch Insurance Company of Ohio Insurance Agreement, bearing policy No. CC63975, with endorsements thereto being Nos. 1, 2, 4, 5, 6, 7, 8, and 9.

2. Defendant, Monarch Insurance Company, is the insurer under the subject policy. It delegated management of its aviation portfolio at all times relevant to Crump Aviation Underwriters, a division of Crump London Underwriters, Inc. Bowes & Company, Inc., of New York was a duly appointed agent for Monarch through Crump for classes of aviation business written on Monarch in New Jersey at all times relevant. Hansman-McAvoy was an insurance brokerage firm located in Massachusetts, which brokered the subject policy.

3. Robert Consalvi and George Beviluaqua were partners and operated Norwood Aviation. Norwood Aviation was a fixed base operator on Norwood Airport, Norwood, Massachusetts; it had a flight school. Dronge had no interest in Norwood Aviation. However, he had in the past purchased several airplanes which were used by Norwood Aviation as student planes. Although Dronge was the owner of these aircraft, all payments on them, insurance matters, and other financial details were handled by persons other than Dronge. Dronge took no part in the daily operation of Norwood Aviation.

4. The principals of Norwood Aviation, Consalvi and Beviluaqua, formed a new corporation, Coastal Air, Inc. Coastal Air was

formed for the purpose of operating an air taxi service.

5. Raymond Baszner was an aircraft consultant and broker who brokered the 402B and arranged for financing with Peoples Trust of New Jersey. Baszner also took part in obtaining Part 135 certification from the Federal Aviation Authority [FAA] for the 402B.

6. Consalvi and Baszner arranged all financial and insurance details involved in the purchase and operation of the 402B for Dronge. They did so under his authorization and were his agents. *Highland Lumber Co., Inc. v. Knudson,* 219 Kan. 366, 548 P.2d 719 (1976); *Rodgers v. Arapahoe Pipe Line Co.,* 185 Kan. 424, 345 P.2d 702 (1959).

7. Consalvi and Baszner proposed the purchase of the 402B to Dronge in July 1974. Dronge anticipated that this plane might eventually be used for air taxi, charter, and rental use through Coastal Air, Inc. if such use could be cleared through the FAA by a Part 135 Certificate. However, the paperwork for this anticipated use was not perfected at the time the plane was purchased.

8. A retail installment contract to purchase the 402B was entered into by Dronge on July 31, 1974. The purchase was financed by the intervenor, Peoples Trust of New Jersey, now United Jersey Bank [United]. United was a loss payee and the beneficiary under the Breach of Warranty endorsement to the insurance policy, effective August 15, 1974.

9. The contract to purchase the aircraft was closed at the Teterboro Airport in New Jersey on July 31, 1974, at which time the relevant documents were signed. Present and in attendance at the closing were Louis Dronge, Robert Consalvi, Raymond Baszner and Robert Beach, who was representing the Peoples Trust. An insurance binder covering the 402B was given to Beach on or before this date.

10. At the time Dronge signed the contract no money exchanged hands. Norwood Aviation was to make all installment payments on the plane, and this was known to Beach and the Peoples Trust. However, Dronge was the sole owner and bore responsibility for payments.

11. There is conflicting testimony whether Beach was advised on or before the closing that it was anticipated that the 402B would be put up for Part 135 certification and would be used for charter, rental, and air taxi service. [Baszner testified that he told Beach; Beach and Dronge testified that Beach had not been told.]

12. Dronge did not personally arrange for insurance on the 402B. Consalvi contacted Joseph Rowland of Hansman-McAvoy to arrange for insurance on the 402B.

13. The first order for an insurance policy was placed by Joseph Rowland of Hansman-McAvoy with James MacDonough of Bowes & Company on July 25, 1974. The terms and conditions of the policy were agreed upon at that time although it was believed that the policy was to be issued for an aircraft bearing FAA Registration No. N4092Q. The aircraft at issue was actually insured on August 15, 1974, when Rowland informed Bowes & Company that he desired identical coverage to that which had been extended for 4092A. Pursuant to the authorization of E. W. Kinnebrew, III, the 402B, N69375, was actually bound effective on August 15, 1974, and a breach of warranty endorsement was also authorized that day to the Peoples Trust of New Jersey.

14. Rowland had not been advised by Dronge's agent Consalvi that an anticipated use was air taxi service, and thus had not placed such an order with MacDonough.

15. The paperwork to obtain FAA authorization to operate air taxi service through Coastal Air had not been completed when the initial insurance order was placed, the FAA had not issued a Part 135 Certificate, and the 402B was not being used at that time for air taxi service. There was therefore no untrue statement of fact. Since the possible air taxi use had not been actualized, there was no misrepresentation in the failure of Dronge, Baszner or Consalvi to advise of the possible future use when the insurance policy was first ordered. Cf. 7 *Couch on Insurance* 2d § 35:4.

16. The initial purpose of use shown on the policy was Industrial Aid, defined in the policy as meaning the uses enumerated in the definition of Pleasure and Business [personal and pleasure use and use in direct connection with the insured's business, excluding any operation for which a charge is made], and also including transportation of executives, employees, guests and customers, still excluding any operation for which a charge was made. There is no basis for rescission of the policy in Monarch's designation of this purpose of use based on the representation of Dronge and Consalvi.

17. On November 1, 1974, a written lease agreement covering the 402B was entered by and between Dronge as lessor and Coastal Air as lessee. The lease was a part of Coastal's plan to obtain a Part 135 Certificate. The lease agreement by its terms delegated exclusive use of the 402B to Coastal Air; Baszner deemed this necessary for a Part 135 Certificate. The creation of this lease did not alter the designation of persons responsible for the daily operation of the plane, Consalvi and Norwood employees. The lower pilot qualifications contained in the lease did not alter the pilot qualifications of the insurance policy, which at that time designated Consalvi or other persons with certain qualifications. The lease was not created with the purpose, nor did it have the effect, of defrauding or making any misrepresentation to Monarch or its agents.

18. Rowland prepared a CAB Form 257, Certificate of Insurance, as part of the effort to obtain the Part 135 Certificate; this form advises the FAA that proper insurance coverage exists. Rowland was advised by at least November 20, 1974, the date the form was executed, of the anticipated air taxi use and the increased insurance need. The form also makes it clear that Rowland was aware that Norwood Aviation and Coastal Air were involved in the operation of the 402B, since these entities were listed along with Dronge as the Air Taxi Operator to whom a policy of insurance had been issued.

19. MacDonough also prepared a CAB form 257. MacDonough was advised of the anticipated air taxi use by at least January 10, 1975, the date that Endorsement No. 9 to the policy was issued effective and the date that Coastal Air received its Part 135 Certificate. This date was before the airplane crash occurred.

20. Endorsement No. 9 changed the purpose of use declaration from Industrial Aid to "Carriage of Passengers and/or Cargo for Hire or Reward."

21. The insurer intended the term "Carriage of Passengers and/or Cargo for Hire or Reward" to be synonymous with charter, that is, a situation where the plane and crew are both hired out. The insurer intended that this term did not include rental use, that is, a situation where only the plane is hired out, not the crew, and the persons hiring the plane pilot it themselves.

22. Rental use of the plane is a significantly greater risk than charter, in part because of loss of control of the plane, and the insurer would not have insured a rental use risk, had it been advised that such a risk was contemplated.

23. The policy does not define the term "Carriage of Passengers and/or Cargo for Hire or Reward." On its face it does not cover charter and exclude rental, but encompasses any situation where a charge is made. A reasonable person could have believed that both charter and rental were covered by this language. The term is ambiguous. The exclusion of rental use was not made clear to the insured. The term must be resolved against the insurer, and rental use cannot be the basis for a denial of coverage.

24. Dronge or Consalvi did not advise the insurer of any possible rental use when the purpose of use was changed. However, the insurer had been advised that Part 135 certification was being obtained. Since it is not clear from the ambiguous purpose of use clause that rental use was excluded, it could not have been clear that potential rental use should be clearly explained to the insurer. Dronge believed

that appropriate insurance existed and intended no deceit. Nor do we imply deceit, since we find that the insured could not have known that rental use should have been explained. There was therefore no intentional misrepresentation. Furthermore, although the insured's failure to advise of rental use had a tendency to mislead the insurer, this cannot be held against the insured because the ambiguous purpose of use clause is resolved in the insured's favor. There is no basis for rescission that the insurer was not advised of possible rental use. Cf. 7 *Couch on Insurance* 2d § 35:4.

25. On or about February 19, 1975, the 402B ran out of fuel and crashed in Sedgwick County, Kansas. The two pilots at the time of the crash were Charles Pappas and Edward Kelley and subsequent investigation revealed that the aircraft was carrying a cargo of marijuana.

26. The illegal use alone cannot be the basis of denial of payment under the policy, as per this Court's Order of August 24, 1978.

27. There is no evidence that Dronge knew or consented to the use of the airplane for the smuggling of marijuana. The insurer had not met its burden of proof that Part III, Exclusion (g), the exclusion for illegal use of the airplane with consent of the insured, should be applied to deny payment. Exclusion (g) cannot be the basis for denial of payment under the policy, and the illegal use of the airplane will not bar Dronge's recovery.

28. At the time of the crash, the insurance policy together with Endorsement No. 9 thereto provided that:

The coverage afforded by this policy shall not apply while the aircraft is operated in flight by other than the following pilots; Any person having a current and valid certificate from the Federal Aviation Agency designating him a commercial pilot, airplane category with multi engine land and instrument ratings, who has a minimum of 2500 total logged flying hours including at least 1000 hours as pilot in command of multi engine aircraft of which not less than 50 hours have been in Cessna 400 series aircraft.

29. This provision by its terms excludes coverage in certain situations; it does not by its terms warrant anything. The provision is thus an exclusion, not a warranty, and the burden of proof that it has been met is on the insurer. *Baugher v. Hartford Fire Ins. Co., supra.*

30. Pappas met most of the pilot qualifications set out in Endorsement No. 9, but he did not have 50 hours as pilot in command of a Cessna 400 series aircraft. However, Pappas was in the right seat of the plane when it crashed, and thus was a co-pilot rather than pilot in command. His failure to meet the qualifications cannot be used to deny payment since he was not the pilot.

31. Kelley was in the left seat, and was the pilot in command when the plane crashed. The only evidence about the qualifications of Kelley was that Pappas thought he was a commercial pilot. Since Kelley was the pilot, it is his qualifications which must be considered. It is unproved whether Kelley met the qualifications.

32. The insurer failed to meet its burden of proof that Kelley was not qualified under the policy. The exclusion provision on pilot qualifications cannot be the basis for denial of payment under the policy.

33. Keith Pappas nor Kelley were Norwood or Coastal Air employees. According to Pappas, the informal arrangement for use of the 402B which he had with Consalvi was that the smugglers were to pay Consalvi $2000 to $2500 per month, were to pay their gas and maintenance expenses, and that Consalvi was to receive $5000 a run above and beyond upon the success of completion of the run.

34. The plane alone, without crew, was hired out to Pappas by this informal arrangement, and the use was therefore rental rather than charter.

35. Construing the ambiguous purpose of use provision, "Carriage of Passengers and/or Cargo for Hire or Reward," against the insurer, the rental use of the airplane at

the time of the crash cannot be a basis for denial of payment under the policy.

36. After the crash, the airplane was impounded by the Sedgwick County, Kansas, sheriff's office, which removed the aircraft to "Floair" located at the Wichita Municipal Airport. The nosepiece and sides of the plane suffered additional damage during the removal process, but this additional damage was insubstantial in comparison to the damage caused by the crash. The insurer did not prove the amount of dollar damage which the aircraft suffered in the removal.

37. The cost of repairing the plane would have been at least $99,000, excluding internal damage which was not investigated. Internal damage was likely since the aircraft was damaged while in motion. Internal damage repairs could have added an additional $15,000 to the cost of repair.

■ 38. The cost of repair approached, equalled, or exceeded the price which could have been achieved for the repaired airplane, no more than $104,000 wholesale or $112,000 if there was no engine damage. The plane was therefore a total loss, and was appropriately sold for salvage.

■ 39. The policy provision excluding losses resulting from governmental seizure is not brought into play by the additional damage which was sustained in the removal of the plane to Floair. There was no loss resulting from governmental seizure because the 402B was a total loss as a result of the crash and would have been appropriately sold for salvage whether or not the plane had been removed.

40. The insured value of the plane was $183,000. The cost of repairs was at least $99,000. The fair market value of the plane before the crash was no greater than $148,000 retail. The deductible is $500 (Endorsement No. 9).

41. The body of the insurance policy, Part III, p. 2, provides:

Limit of Liability and Deductible

The liability of the Company for direct physical loss of or damage to the aircraft shall not exceed the amount of insurance set out in the declarations, less the applicable deductible, nor what it would cost to repair or replace the aircraft or parts thereof with other of like kind and quality, and without compensation for loss of use....

A subsequent endorsement, Endorsement No. 1, dated October 18, 1974, and retroactively effective July 24, 1974, provides:

In consideration of the premium charged hereon, it is hereby understood and agreed that notwithstanding anything to the contrary contained in Part III—Pyhsical [sic] Damage of the Policy Provisions—Part B, the limit of the Company's liability for total loss of the Insured's aircraft shall be the insured value of the aircraft as stated in the Declarations subject to any applicable deduction as provided for in the Policy Provisions.

■ 42. Endorsement No. 1 prevails over the irreconcilable printed provisions of Part III on limits of liability. *Lindesmith v. Republic Mutual Fire Ins. Co.*, 189 Kan. 201, 368 P.2d 35 (1962); *Wise v. Westchester Fire Insurance Co.*, 463 F.2d 386 (10th Cir. 1972).

■ 43. The printed policy provision setting the limit of liability as the repair or replacement cost of the aircraft are irreconcilable with the provision of Endorsement No. 1 setting the limit of liability as the insured value less the deduction. The limit of insured value less the deduction prevails, and the insured is entitled to recover under the policy $183,000 less $500, or $182,500.

44. All premiums for the policy were paid through the date of the crash. Said premiums were paid through Hansman-McAvoy by either Consalvi or Baszner and were paid in cash.

45. Notice of Loss and Proofs of Claim in accordance with the insurance agreement and all endorsements were filed by Dronge and Peoples Trust and were received by Monarch; letters to Monarch are dated March 24, 1975, April 15, 1975, August 1, 1975, August 18, 1975, and September 5, 1975. Monarch made no direct response to any of these letters.

46. The Monarch Insurance Company of Ohio issued a reservation of rights letter on April 1, 1975, which letter was received by Peoples Trust but was not received by Dronge. The letter stated that Monarch was aware of the pending investigation of the possible illegal use of the aircraft, and that if the aircraft had been used illegally, it would constitute a violation of the terms and conditions of the policy as to illegal use of the aircraft and possibly other terms and conditions of the policy.

47. On June 19, 1975, Peoples Trust repossessed the 402B, which was sold for salvage for $26,160.

48. Subsequent to the crash of the 402B, Peoples Trust brought suit against Monarch and Dronge in the Superior Court, Bergen County, New Jersey. Peoples Trust obtained a default judgment against Dronge.

49. The New Jersey litigation was settled by the parties thereto under an agreement dated February 10, 1978. By that agreement, Monarch agreed to pay to United $120,000 under the breach of warranty endorsement, United agreed to assign to Monarch its default judgment against Dronge to the extent of $120,000, and United's default judgment against Dronge was modified to the sum of $190,000.

50. The Settlement Agreement, which all parties to this law suit signed, further provided:

> In the event that Dronge is entitled to any sum of money by virtue of the aforesaid Kansas action [this action] from Monarch it is agreed that said monies shall be distributed in the following manner:
>
> a) The first $120,000.00 shall be repaid to Monarch;
>
> b) The next $70,000.00 shall be paid to United; and
>
> c) The balance, if any, shall be paid to Dronge.

51. There is no evidence that Dronge's agreement to this settlement, including the distribution of monies awarded in this action, was other than voluntary.

52. Monarch did not act in bad faith in its failure to pay the loss to Dronge or United. It was clear from the date of the crash that the 402B was being used to smuggle marijuana when it went down. There was thus a basis in fact for the insurer's claim that payment was precluded by the exclusions in Part III, either Exclusion (f) for any unlawful use, or Exclusion (g) for unlawful use with the consent of the insured. The claim that Exclusion (f) applied was only recently denied by this Court's decision of August 24, 1978, that (f) was ambiguous when compared with (g), and that the ambiguity must be resolved against the insured. Although Monarch was wrong, the misconception on which it based its refusal to pay was not such that would indicate an arbitrary, capricious, or bad faith motive. *Van Hoozer v. Farmers Insurance Exchange, supra.* There was sufficient merit to the company's position that an allowance of attorney's fees should not be made. *Alliance Life Ins. Co. v. Ulysses Volunteer Fireman's Relief Ass'n, supra.*

## CONCLUSIONS OF LAW

1. The United States District Court for the District of Kansas has jurisdiction of the parties hereto and the subject matter hereof. All proper, necessary and indispensable parties are parties hereto.

2. Venue is properly laid in this district.

3. The law governing the issues in this lawsuit is the law of Kansas.

4. There was no material misrepresentation of fact by Dronge or his agents upon which Monarch relied to its detriment at the time of the issuance of the policy or any endorsement thereto, and Monarch is not entitled to rescission on the policy.

5. Damages sought by Dronge are included in the coverage afforded by the insurance policy, and are not excluded.

6. Payment under the policy is in the amount of $182,500, plus interest thereon from February 19, 1975, payable by Monarch.

12

7. The Settlement Agreement in the New Jersey litigation, signed by Dronge, is valid and enforceable. By virtue of that Agreement, Monarch is entitled to a set-off or credit against the judgment in the amount of $120,000. United is entitled to the next $70,000 of the judgment, or portion thereof. The remainder, if any, shall be paid to Dronge.

8. Monarch, having questioned coverage and issued reservations of rights in good faith, is not legally liable for plaintiff's attorney's fees in either this action or the action brought in New Jersey by Peoples Trust.

In accordance with the foregoing findings and conclusions,

IT IS ORDERED that the prevailing party or parties will prepare, circulate and submit an appropriate judgment in accordance with these findings and conclusions. Costs shall be assessed against the defendant.

Dated this 10 day of January, 1979, Wichita, Kansas.