PALOS BANK AND TRUST COMPANY, Trustee, Plaintiff-Appellant, *v.* GUS KARDARAS *et al.*, Defendants-Appellees.

First District (4th Division) No. 80-3075

Opinion filed February 18, 1982.

506

Marsh and Marsh, of Wheaton, for appellant.

Wischhover and McGinnis, of Palos Hills, for appellees.

JUSTICE ROMITI delivered the opinion of the court:
The parties entered into a contract, the plaintiff to sell and the defendants to buy, certain real estate. The contract was contingent upon the defendants being able to obtain financing in a specified amount or a lesser amount accepted by defendants. The only issue before this court is whether the trial court, as trier of fact, erred in ruling that the defendants, who paid $2,000 to secure a mortgage commitment for a lesser amount than specified in the contract from one bank while seeking secondary financing, had not accepted that first mortgage as the sole financing within the meaning of the real estate contract. We agree with the trial court that they did not and affirm.

Palos Bank and Trust Company, the plaintiff, as trustee, was the owner of certain real estate. A contract was entered into between seller and Sirles and Son Realty Company, Inc., giving the latter exclusive right to list and sell the property for 24 hours. Despite contrary testimony at trial, the date on the contract which was in the record and stipulated to is January 21, 1978. A contract to sell the property for $275,000 to defendants Kardaras and Berios was executed on October 21, 1978. This contract was conditioned on the purchasers beng able to procure, within 60 days, a firm commitment for a loan to be secured by a mortgage "in the amount of $225,000, or such lesser sums as PURCHASER accepts" with interest not to exceed 10% a year to be amortized over 25 years, the commission not to exceed 3%. First Federal of Chicago (First Federal) on February 2, 1979, offered defendants a 25-year, $200,000 mortgage, at 10 3/4%. According to the letter, the commitment would terminate two months from the date of the letter. However, to secure the commitment, a nonrefundable fee of $2,000 would have to be paid by February 12. The loan approval was subject to several requirements including the condition that there be no secondary financing. A copy of this letter was sent to Dominick Ferro, a salesman of Sirles and Son.

The Bank of Hickory Hills (Hickory Hills) on February 9, 1979, sent a letter approving a seven-year assignment of beneficial interest loan for $30,000 at 13.70%, the commitment to expire in five days. Upon acceptance of the commitment, the letter was to be signed by defendants and returned to Hickory Hills. The letter was neither signed nor returned to Hickory Hills. Furthermore, no appraisal fee or credit report fee was paid to Hickory Hills although the commitment was made subject to both conditions.

On March 2 David Hill, a vice president of the beneficial owner, demanded that defendants close the transaction, stating that the financing contingency was satisfied by the $200,000 loan from First Federal and the $30,000 from Hickory Hills. Defendants responded that the loan commitments were unacceptable because (1) the commitment with First Federal was for $200,000 and not $225,000 and it forbade secondary financing; (2) even if that prohibition would be overlooked, the arrangement with Hickory Hills was unacceptable because of the time period and interest rate.

All of these facts were stipulated by the parties before trial. It was also stipulated that the sole issue between the parties was whether defendants accepted the financing made available to them as acceptable but different than the terms specifically set forth in the contract.

Seller sued for forfeiture of the $10,000 held in escrow by Sirles and Son. Defendants counterclaimed for its recovery. The case was decided on the merits after a full trial before the judge, sitting as trier of fact as well as law. The court ruled for the defendants on both the claim and counterclaim.

At trial, three witnesses testified: Dominick Ferro, salesman of Sirles and Son, David Hill, stipulated to be plaintiff's agent, and Gus Kardaras, one of the defendants.

Ferro at the time in question had been a salesman for Sirles and Son. He testified that there had already been a listing agreement on behalf of Sirles and Son with the plaintiff and he was instrumental in having a contract executed. He admitted that if the plaintiff won the case, the company would receive 25% of the award and he personally would receive 12½% of that.

As a real estate man, he helped defendants to get a mortgage. He suggested certain banks. Ferro denied that he ever went with Kardaras to the banks but agreed that an office manager did go with Kardaras to Hickory Hills. That officer called the bank to arrange for the loan review application. While Ferro testified that it was his opinion that the First Federal commitment met the terms of the contingency clause of the real estate contract, he had recommended that Kardaras go to Hickory Hills because Ferro knew Kardaras needed $225,000 by way of mortgage. The

first mortgage was acceptable, but it obviously was not enough since it was only for $200,000 and not $225,000.

According to Ferro, Kardaras telephoned Ferro and informed him of his acceptance by First Federal. Likewise sometime after February 9, 1979, Kardaras telephoned him and said he had been accepted by Hickory Hills. First, Ferro stated that Kardaras did not express any satisfaction or dissatisfaction regarding the latter. Later he contradicted himself and said Kardaras had indicated that the financing issued and available was satisfactory. This was after February 9, but the witness did not know how soon after that date. At another point he admitted that he did not remember most of the telephone conversations.

Ferro stated that Kardaras did not indicate his dissatisfaction untill three or four weeks later. The thing he was dissatisfied with was that he had to transfer his assets from Continental Bank to Hickory Hills.

Ferro also testified that he sent copies of the commitment to Hill. Ferro had received the letters from the banks.

Hill, at the time in question, had been the executive vice president of all marketing of multi-family and single-family and land developments of Town and Country, the beneficial owners of the property. He testified that he recommended to Ferro that he direct the purchaser to First Federal. Ferro called him about the middle or end of the first week of February and informed him that a first mortgage commitment had been issued by First Federal. About 48 hours later, Ferro telephoned him and informed him that a second mortgage had been arranged, that a copy of the commitment would be forthcoming and Hill should "pull title; they had a deal." Ferro sent him the copies of the commitment letters. Neither defendant indicated to Hill that the loan commitments had been accepted. Hill did learn that the fee had been paid to First Federal; he believed that he telephoned the bank to find out.

Hill denied that he considered Ferro to be his agent. He admitted signing an exclusive listing agreement but stated that it was signed purely as a courtesy to get Ferro a larger share of the commission. The listing contract was signed after the real estate contract was signed. He agreed that the real estate contract listed Sirles and Son as the broker.

Kardaras testified that he made applications to different banks in Chicago. At the end of January 1979, the broker sent him to First Federal Savings and Loan. It was to obtain financing at 10% interest, 25 years and not over 3 points. They told him to go there and talk to Mr. Shepp and that he had the money available. The application was at Shepp's desk. Kardaras just signed the application and walked out. He did not actually meet Shepp. Kardaras already knew he was going to give him $200,000 as the broker had told him so.

$200,000 was not enough so about one or two days later he made application for a $30,000, 25-year second mortgage at Hickory Hills. Both Ferro and an officer from the real estate company were present when he made the application.

Kardaras received the commitment letter from First Federal during the first week of February. Ferro told him to wait for the Hickory Hills' answer. The broker also told him not to worry about the restriction on secondary financing. "He told me don't worry. Go and talk to Mr. Shepp, and he knew me, and we talked to him already and don't worry about that."

On February 9, Don Turns called Kardaras from Hickory Hills and told him the bank had accepted the mortgage and would send him a letter.

Under the letter sent by First Federal, he had 10 days to pay half the points. He made that payment the last day he had. He had not yet received the letter from Hickory Hills and he did not have any more time to wait for it. He did not, at that time, know the terms of the mortgage at Hickory Hills. He finally received that letter either February 13 or 14 and immediately told Ferro he could not accept the loan under the terms asked. There were several other phone calls in which Ferro tried to make him accept the second mortgage. He refused.

When asked if Ferro was working for him or for someone else, Kardaras answered "look like work for me and work for somebody else too." When further asked by plaintiff's counsel whether Kardaras considered Ferro his agent or the seller's, he answered "I know he got paid from the seller, and he going to work for the seller." He agreed with plaintiff's counsel's statement that he knew Ferro was working not for him but for the seller.

After hearing the evidence and arguments of counsel, the trial court ruled for defendants on both the plaintiff's complaint and the counterclaim, stating that the broker had been aware that almost simultaneously with the application for the first mortgage there was an application for a second mortgage; the terms differed greatly from the terms of the contract; and there were no acts indicating a waiver.

I

■■ Plaintiff does not contend that defendants obtained a mortgage conforming to the specifications set forth in the contract. What plaintiff does contend is that defendants, by paying the $2,000, accepted the nonconforming mortgage from First Federal and that this acceptance waived the specification clause. This contention is without merit because (1) defendants never accepted the First Federal mortgage offer and (2)

even if they had, that mortgage was, as the trial court considered, inexorably linked with the second mortgage application to the Bank of Hickory Hills. There can be no dispute that the Hickory Hills' totally nonconforming commitment was not accepted since the parties stipulated that the letter of commitment was not signed and returned to the bank as accepted nor were the fees paid.

Under the terms of the commitment letter of First Federal, all the defendants' payment of $2,000 did was to secure the commitment for two months, that is, for two months the bank could not rescind its offer. This was an option contract. (See Restatement (Second) of Contracts §25 (1981).) By paying the $2,000 the defendants had acquired the right to accept or reject the offer within two months. (*Morris v. Goldthorp* (1945), 390 Ill. 186, 60 N.E.2d 857.) First Federal was bound to keep the offer open for two months. It was also required to loan the money if defendants within the two months accepted the offer and complied with the other conditions set forth in the letter. But contrary to the plaintiff's contention, payment of the $2,000 did not, of itself, bind the bank to loan the funds.

However, even if defendants' payment of the $2,000 were to be considered as an acceptance of First Federal's commitment, this was not sufficient since, as the trial court found, the two applications were inexorably intertwined and Hickory Hills' commitment was never accepted.

The evidence was sufficient to support the trial court's finding, as trier of fact, that the two mortgages were inexorably intertwined. Kardaras testified that the applications were made within days of each other and that the broker sent him to Hickory Hills because First Federal was only willing to loan $200,000. Ferro agreed that he sent Kardaras to Hickory Hills because the first mortgage was not enough. Indeed, according to Kardaras, both Ferro and an officer of Sirles and Son were present when he made the second application. Likewise Kardaras testified that when he received the first commitment Ferro told him to wait for the Hickory Hills' answer. Ferro notified Hill of the acceptance of the applications by both banks and it was only after the acceptance by Hickory Hills that he said they had a deal. Hill's letter of March 2 did not state that the commitment of First Federal satisfied the conditions but rather that the commitments of First Federal and Hickory Hills satisfied the condition. Since the two applications were intertwined, it is clear that any acceptance of First Federal's commitment could only have been conditional and that it fell when the totally nonconforming response from Hickory Hills was rejected.

Plaintiff contends that defendants could not have intended to use the loan from Hickory Hills if it had been obtained since the commitment

letter from First Federal precluded secondary financing. However, the conduct of all three parties, as previously described, clearly establishes that they did intend to use it. Furthermore, Kardaras testified that Ferro told him not to worry about the restriction. And there was no evidence that the provision could not have been waived or that Kardaras could not have obtained the $200,000 from First Federal even if he had obtained a second mortgage from Hickory Hills.

Plaintiff also contends that defendants' communication of their acceptance to the seller waived their right to insist on the terms set forth in the contingency clause. Since there was never any acceptance, this argument fails. In addition, as Hill admitted, neither defendant communicated any acceptance or indication of satisfaction to Hill. Hill testified that Ferro told him that the banks had accepted the application. This was an acceptance by the banks, not by the defendants. Hill did not say Ferro told him defendants had accepted the commitment; the only knowledge Hill had of the payment of the $2,000 came from his own telephone call to the bank, and it was not a communication by either the defendants or Ferro. Furthermore, the evidence in the record was insufficient to show either that Ferro, at the time in question, was acting as an agent of the defendants or had the authority, actual or apparent, to accept the contract contrary to the wishes of the defendants. The burden to prove agency and the scope of authority is on the person seeking to charge the alleged principal. *Schoenberger v. Chicago Transit Authority* (1980), 84 Ill. App. 3d 1132, 405 N.E.2d 1076; *Easterday v. Marchman* (1962), 36 Ill. App. 2d 321, 183 N.E.2d 182.

In any event, waiver is the intentional relinquishment of a known right. (*Pantle v. Industrial Com.* (1975), 61 Ill. 2d 365, 335 N.E.2d 491; *Florsheim v. Travelers Indemnity Co.* (1979), 75 Ill. App. 3d 298, 393 N.E.2d 1223, *appeal denied* (1979), 79 Ill. 2d 620.) Since it is clear from the evidence that defendants never intended to rely on the First Federal's loan alone, communication of either the application or its acceptance by First Federal, even if that communication had been authorized by defendants, would not have waived defendants' right to rely on the contingency clause.

Ferro at one point in his testimony stated that sometime after February 9 Kardaras said he was satisfied with the loan. Kardaras denied this and stated that immediately upon receipt of the letter from Hickory Hills he informed Ferro he could not accept it. Credibility of the witnesses is for the trier of fact to determine. (*People ex rel. Borelli v. Sain* (1959), 16 Ill. 2d 321, 157 N.E.2d 417; *Guzell v. Kasztelanka Cafe and Restaurant, Inc.* (1980), 87 Ill. App. 3d 381, 408 N.E.2d 1124.) Moreover Hill has never contended that Ferro communicated this statement to him,

and in light of the fact Hill denied under oath that Ferro was his agent, plaintiff cannot contend that any communication to Ferro was *ipso facto* a communication to it.

## II

■■ In its brief plaintiff raises several other issues such as whether defendants were "unable" to obtain a satisfactory mortgage; whether defendants exercised good faith or reasonable efforts in their attempts to secure the required financing; and whether defendants breached the contract by failing to give the plaintiff a 60-day period in which to secure financing, as required in the contract. None of these issues were raised below, and they cannot be raised here. (*Waterford Condominium Association v. Dunbar Corp.* (1982), 104 Ill. App. 3d 371, 432 N.E.2d 1009; *Marynczak v. D & L Transport Co.* (1981), 94 Ill. App. 3d 381, 418 N.E.2d 972.) Indeed, the parties stipulated that the sole issue to be determined was whether defendants accepted the financing. This stipulation was binding on the parties and the court. (*Ziebell v. Board of Trustees* (1979), 73 Ill. App. 3d 894, 392 N.E.2d 101; *Bridges v. Neighbors* (1975), 32 Ill. App. 3d 704, 336 N.E.2d 233.) Having stipulated as to the only issue before the court, no other issues can be raised.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

JIGANTI and LINN, JJ., concur.