A. MILLER AND COMPANY, Plaintiff-Appellant, v. CINCINNATI INSURANCE COMPANY, Defendant-Appellee.

Third District   No. 3—90—0681

Opinion filed August 23, 1991.

W. Thomas Johnston, of Quinn, Johnston, Henderson & Pretorius, Chartered, of Peoria (John J. Waldman, of counsel), for appellant.

Elizabeth W. Christensen, of Heyl, Royster, Voelker & Allen, of Peoria (Gary D. Nelson, of counsel), for appellee.

JUSTICE SLATER delivered the opinion of the court:

This is a dispute over the interpretation of an interruption of business clause in an insurance policy. We affirm the trial court, which held for the insurer.

Plaintiff, A. Miller & Company, is engaged in the business of purchasing scrap metal, shredding it, and selling the shredded metal. Plaintiff was insured by defendant Cincinnati Insurance Company, under a policy which included an endorsement providing protection against the interruption of plaintiff's business. The endorsement stated in part that the defendant agreed:

"1. To pay the insured the amount of Daily Indemnity, [$10,000] specified in Item 2, for each Day of Total Prevention of Business;

2. To pay the insured a part of the Daily Indemnity for each Day of Partial Prevention of Business; and

3. To pay that amount of expense which is reasonably incurred by the insured or the company to reduce or avert Prevention of Business, but only to the extent that the total

amount, that otherwise would have been paid under Sections 1 and 2 of this Agreement, is thereby reduced ***."

In addition, paragraph E, titled "Reduction of Payment," provided:

"As soon as possible after an Accident the insured shall resume Business, in whole or in part, and shall utilize every available means, including *** surplus or reserve stock, which may be owned, controlled or used by the insured, which might reduce the amount for which the company would otherwise be liable under this Endorsement. *** All extra expense so incurred, by the insured as permitted in Section 3 of the Insuring Agreement *** shall be a part of and not in addition to the Limit of Loss."

On October 15, 1988, the motor on a hammer mill machine used in plaintiff's shredding operation broke down, preventing plaintiff from shredding metal for 32½ days. While the hammer mill was being repaired, plaintiff used 5,500 tons of its reserve finished stock of shredded metal to meet existing contractual obligations. Plaintiff had an inventory of reserve stock sufficient to meet sales demand during the time that it was unable to produce shredded metal, and, as a result, plaintiff suffered no loss of gross income. Plaintiff was able to rebuild its inventory of shredded metal to its former level within 60 days after the hammer mill machine was repaired.

Plaintiff filed suit for declaratory judgment seeking a finding that defendant was liable under the policy for the expenses related to the replacement of its reserve stock. The parties stipulated that plaintiff was entitled to expenses of $22,960 which it incurred as additional storage and moving costs. They further stipulated that if the cost of the reserve stock was an "expense reasonably incurred to reduce or avert a prevention of business," then the recoverable expenses were to be increased by $154,000, which represented the cost of the raw materials used by the plaintiff to replenish its inventory of reserve stock.

■■ The trial court granted summary judgment for the defendant, finding that the replacement of plaintiff's inventory was not a reimbursable expense under the insurance policy. The parties agree that no questions of material fact remain to be resolved, but the plaintiff contends that the trial court erred in construing the provisions of the insurance policy. Construction of an insurance policy is generally a question of law to be decided by the court. (*Community State Bank v. Hartford Insurance Co.* (1989), 187 Ill. App. 3d 110, 542 N.E.2d 1317; *King v. Equitable Life Assurance Society of the United States* (1984), 125 Ill. App. 3d 542, 466 N.E.2d 353.) The sole

issue presented, given the stipulation and agreement of the parties in this case, is whether the cost of replacing plaintiff's inventory of reserve stock is a reimbursable expense under the insurance policy.

■ Plaintiff also maintains that the defendant's failure to define the term "expense" created an ambiguity which should be construed against the defendant insurance company. While ambiguous language in an insurance policy should be construed in favor of the insured (*Dora Township v. Indiana Insurance Co.* (1980), 78 Ill. 2d 376, 400 N.E.2d 921), this rule of construction does not apply when no real ambiguity exists (*Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 475 N.E.2d 872). The mere absence of a definition does not necessarily render the language of a policy ambiguous (*Keyser v. Connecticut General Life Insurance Co.* (N.D. Ill. 1985), 617 F. Supp. 1406), nor is an ambiguity created simply because the parties disagree about the meaning of the policy language (*Federal Savings & Loan Insurance Corp. v. Pacific Employers Insurance Co.* (1978), 63 Ill. App. 3d 157, 161, 379 N.E.2d 682, 686 (Romiti, J., dissenting)). "If the words of a policy can reasonably be given their plain, ordinary, and popular meaning, the provisions should be applied as written and the parties should be bound to the agreement they made." *Western Casualty*, 105 Ill. 2d at 495, 475 N.E.2d at 876.

Plaintiff contends that the term "expense" as used in the insurance policy includes the cost of the raw material used to replace the inventory which it used in order to prevent a loss of income. Although plaintiff relies on *Northwestern States Portland Cement Co. v. Hartford Fire Insurance Co.* (8th Cir. 1966), 360 F.2d 531, we believe the decision in that case supports the defendant insurance company's position. In *Portland Cement*, the insured operated two adjacent cement manufacturing plants in Mason City, Iowa. A fire destroyed the induction draft fan located in plant No. 2, rendering its 400-foot-long kiln inoperable. The manufacturing process consisted of three basic steps: (1) quarrying, crushing, and blending limestone with clay; (2) heating the blended mixture of powdered limestone and powdered clay in the rotary kiln where a chemical reaction occurs resulting in a product known as clinker; and (3) grinding clinker to the required degree of fineness and inserting additives.

Due to the fire plant No. 2 was unable to produce clinker. The insured was therefore required to use its older, less efficient, plant No. 1 to produce clinker. The insured did not suffer any loss of sales as a result of the inoperable kiln because it had on hand a large in-

ventory of finished cement and a substantial amount of stockpiled clinker to meet contract requirements and customer demands.

The insured contended that the interruption of business policy entitled it to the value of the clinker it would have produced had there not been a fire. Because there was no readily ascertainable market price for clinker, the insured claimed the proper measure of damages to be the net sales price of finished cement multiplied by the production lost during the interruption period reduced by various costs of production which were not incurred. The insurer contended that the proper measure of damages was the expense in excess of normal that the plaintiff incurred in replacing the finished stock (cement) sold to reduce the loss.

The *Portland Cement* court disagreed with the insured's interpretation of the policy and found that the policy was designed to insure against loss of earnings. In the absence of loss of earnings, liability was limited to the extra expense necessary to prevent the loss of earnings. The court held that based on the language of the policy the insured was entitled to receive only those expenses, in excess of normal, which were incurred in replacing the finished stock. This extra expense was the excess cost incurred in replacing the inventory due to using the older and less efficient plant No. 1. The court stated that allowing the insured to recover the amount it sought would put the insured "in a better position than if no shutdown had occurred." *Portland Cement,* 360 F.2d at 534.

▮▮ Similarly, we believe that allowing plaintiff to recover the cost of the raw materials used to replenish its inventory would put plaintiff in a better position than it would have been in if no breakdown had occurred. The general purpose of business interruption insurance is to protect the earnings which the insured would have enjoyed had no interruption occurred. (*Portland Cement,* 360 F.2d at 534.) It is undisputed that plaintiff suffered no loss of income, nor did it incur any *additional* expense other than the $22,960 agreed upon by the parties. What plaintiff seeks to recover is the stipulated $154,000 cost of the raw materials used to rebuild its inventory. Plaintiff was obligated to utilize its "reserve stock" (inventory) as a condition of the policy. In any event, production of shredded metal requires the acquisition of the raw product. To allow the raw material costs to be recovered under the policy would provide plaintiff with a double recovery.

*Eastern Associated Coal Corp. v. Aetna Casualty & Surety Co.* (W.D. Pa. 1979), 475 F. Supp. 586, *aff'd in part & rev'd in part & remanded* (3d Cir. 1980), 632 F.2d 1068, cited by plaintiff, is factu-

ally inapposite. In that case the insured was forced to purchase coal on the open market and sell it at a loss in order to meet existing contractual obligations. Here plaintiff was able to fulfill all of its contractual obligations from existing shredded metal without having to cover in the open market.

We believe that plaintiff could have claimed that it was entitled to any *additional* expenses it incurred in replacing its inventory. Such expenses would not include the cost of the raw materials but might include any costs above those normally incurred for labor, utilities, and other overhead necessary to shred the metal needed to rebuild plaintiff's inventory. The parties have stipulated to the facts in this case, however, and have presented the trial court and this court with the single issue of whether the cost of the inventory was an expense under the insurance policy. Having decided that issue in favor of the defendant, we will not consider whether plaintiff may have been entitled to an amount greater than the $22,960 agreed to by the parties. See *Palos Bank & Trust Co. v. Kardaras* (1982), 104 Ill. App. 3d 505, 432 N.E.2d 1123 (when the parties have stipulated to a single issue, others may not be raised).

■■ We believe that when the term "expense" is considered in the context of the entire policy (see *Western Casualty*, 105 Ill. 2d at 493, 475 N.E.2d at 876) and considering the purposes for which the policy was obtained (see *Dora Township*, 78 Ill. 2d at 378, 400 N.E.2d at 922), it is clear that the cost of replacing plaintiff's inventory was not an "expense" under the policy. We find no ambiguity. We hold, therefore, that plaintiff was not entitled to recover the cost of its reserve finished inventory, and we affirm the judgment of the circuit court.

Affirmed.

STOUDER, P.J., and BARRY, J., concur.